[No. G046491. Fourth Dist., Div. Three. Feb. 4, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
ROMMEL PANGAN, Defendant and Appellant.

COUNSEL

Alan S. Yockelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Michael Pulos, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BEDSWORTH, Acting P. J.—**

## I.  INTRODUCTION

This is a driving under the influence with injury case (Veh. Code, § 23153) in which the trial judge's conscientious and painstaking calculation of a restitution award failed to take into account the time value of money. When the court computed the value of the victim's $246.50 per month in pension benefits, it multiplied that monthly benefit by a calculated likely lifespan and ordered a payment of $70,000. Defense counsel did not object, and defendant was hit with a restitution order that overstates the victim's actual economic loss by thousands of dollars.

We now hold:

(1) It is an abuse of discretion not to account for the time value of money in determining a victim's economic loss based on a diminished or lost stream of *future* payments.

(2) The failure on defense counsel's part to raise the issue of the time value of money in this case was ineffective assistance of counsel.

(3) No satisfactory explanation is available to excuse counsel's failure.

We therefore reverse the restitution order for a new hearing, so that a new restitution order may be made which does account for the time value of money. In that regard we further hold:

(4) Defendant will not be entitled to a jury trial at the new hearing.

## II.  FACTS

Rommel Pangan was convicted of causing great bodily injury while driving under the influence. (See Pen. Code, § 12022.7.) He was sentenced to six

years in prison. The victim was Oscar Muniz, who sustained serious injuries, including broken ribs, back fractures, and a bad knee injury when his vehicle was hit by Pangan's vehicle traveling down Beach Boulevard on January 23, 2009. This court affirmed Pangan's conviction in an unpublished opinion filed June 30, 2011. (*People v. Pangan* (June 30, 2011, G043845) [nonpub. opn.].)

Pangan had no car insurance. The case returned for a restitution hearing in mid-December 2011.

Muniz requested restitution in four specific particulars: First, he asked for $12,000 for replacement of his vehicle, a 2001 Chevy Silverado. Second, he asked for $15,000, which represented what he expected to earn, as boxer Josh Burnett's coach, had Muniz been able to show up at a boxing match in which Burnett was fighting on the night of the accident. Third, Muniz sought reimbursement of his unpaid medical bills of $8,390.67. And, finally, he asked for restitution for the $246.50 monthly decrease in his pension payments occasioned by his immediate forced retirement from his job as a grocery store warehouse clerk due to his injuries.[1]

For some reason—and the record is completely silent on this point—Muniz did *not* request restitution of his lost wages for the 23 months plus from January 23, 2009, to December 31, 2010.

Prior to the hearing the trial judge wrote a tentative opinion to help clarify his thinking on the decreased pension issue.[2] His tentative opinion was to make a restitution award totaling $85,052.17. The $85,052.17 consisted of but two components: $8,390.67 for the unpaid medical bills and the balance in decreased pension payments. While probation reports filed the day of the hearing detailed Muniz's requests for $12,000 for his lost Chevy Silverado and $15,000 for the loss on the Burnett fight, there is nothing in the record to indicate the tentative opinion proposed to order restitution in any amount for those claimed losses. Nevertheless, at the hearing Muniz testified he sustained both of those losses. At the end of the hearing Pangan's defense counsel presented no argument and simply submitted on the tentative opinion.

Immediately after the submission by the defense on the tentative opinion the trial court made its order. The requests regarding the loss of the Silverado

---

[1] At the time of the accident Muniz was 53 years old, was working in a Ralphs Grocery warehouse, and had been working there for about 20 years. He was covered by the Teamsters Pension Program which would allow him to retire at the end of 2010, at age 55, at the rate of $1,673.50 per month, and in fact was planning to do just that. However, the accident prevented him from working in the years 2009 and 2010, which ultimately reduced the pension he received after December 2010 to $1,427 a month.

[2] Francis Bacon is famous for saying writing makes an "exact man." The same can be said for judges. The trial judge's "Opinion and Order on Restitution" has been of great benefit to this court in understanding the facts and the court's reasoning.

and the money from the prize fight were denied in their entirety. As to the 2001 Silverado, the court found Muniz had been paid the "full value" of the vehicle by his insurance and concluded he sustained no loss on it. As to the hoped-for payment from the Josh Burnett fight, the court found the evidence too speculative and thus insufficient to support any loss from Muniz's absence.

The other two of Muniz's requests became part of the restitution order. The medical bills were an easy matter. The trial judge simply included the $8,390.67 figure in the award.

But the pension issue was more complicated. The original tentative opinion had purported to include 23 months of $246.50 in decreased pension payments for the period February 1, 2009, through December 31, 2010 (the total would have been $5,669.50), in the calculation. After submission, though, the judge changed his mind, given Muniz's ineligibility to receive any pension payments at all in the years 2009 and 2010. Accordingly, he deducted the $5,669.50 from the initial total of $85,052.17 for the years 2009 and 2010. The final lost pension payment total was $70,992.[3] From the order requiring total restitution in that amount Pangan has taken this appeal, focusing on the absence of any accounting for the time value of money in the $70,992 figure.

## III.  DISCUSSION

### A.  *Abuse of Discretion*

#### 1.  *Basic Principles from the Case Law*

Most criminal law restitution cases have not addressed the problem of valuing a stream of payments to be received in the future as against a single lump-sum payment, but one Supreme Court case, *People v. Giordano* (2007) 42 Cal.4th 644 [68 Cal.Rptr.3d 51, 170 P.3d 623] (*Giordano*), has. While *Giordano* did not directly consider the problem of present value, the principles it articulates allow us to decide the issue now.

Like the case before us, *Giordano* arose out of an accident caused by an inebriated driver. There, though, the motorcyclist victim was killed, so the motorcyclist's widow sought restitution for her deceased husband's lost

---

[3] The trial judge arrived at this number by finding Muniz had a life expectancy of 24 years beginning in the year 2011 when he could receive his pension payments. Muniz's pension would have been $1,673.50 a month, but that was reduced by $246.50 because of Pangan's driving under the influence. So the judge took $246.50 and multiplied it by 288 months (24 years) and came up with the figure of $70,992. The $70,992 for the pension combined with the $8,390.67 for the medical bills for a grand total of $79,382.67.

future earnings. The trial court made a restitution order of $168,000, based on multiplying the victim's average annual earnings from the previous three years times five years. (*Giordano, supra*, 42 Cal.4th at p. 650.) The defendant appealed, focusing on the question of whether the widow was herself a "victim" within the meaning of California's restitution law. The Supreme Court eventually took up the case to consider not only the issue of whether the widow really was a victim, but also the problem of compensation for "future economic losses." (See *id.* at p. 651.)

The high court determined the widow was indeed entitled to compensation for prospective economic loss, reasoning it is simply a loss sustained after the occurrence of the crime, and restitution for it was necessary to "restore the economic status quo" prior to the crime. (*Giordano, supra*, 42 Cal.4th at pp. 657–658.) The court specifically noted the analogy to civil wrongful death actions on the point of whether the widow had "personally" suffered an economic loss. (*Id.* at p. 658.)

■ Turning to the issue of "how a trial court should measure" such an economic loss, the *Giordano* court made the point that, even reviewed under an abuse of discretion standard, the trial court must still "employ a method that is rationally designed to determine the surviving victim's economic loss." (*Giordano, supra*, 42 Cal.4th at pp. 663–664.) Thus a trial court, in order to facilitate appellate review, "must take care to make a record of the restitution hearing, analyze the evidence presented, and make a clear statement of the calculation method used and how that method justifies the amount ordered." (*Giordano, supra*, 42 Cal.4th at pp. 663–664.)[4] The point is to show the award is the product of a "reasonable" method and produces a "nonarbitrary result." (*Id.* at p. 665.)

With a typically charitable pen, Justice Moreno, writing for the *Giordano* majority, stated the trial court's "method of calculation was not carefully designed to establish" the widow's loss of support. (*Giordano, supra*, 42 Cal.4th at p. 666.) His opinion noted the award assumed the widow was entitled to receive *all* her deceased husband's annual earnings for her economic support, and further assumed, without a sufficient reason, that five years was the appropriate term for the loss. (*Giordano, supra*, 42 Cal.4th at pp. 665–666.) Even so, despite the "methodological imprecision," the defendant had not shown the award was an abuse of discretion. In particular the *Giordano* court noted that, given the motorcyclist victim's relative youth at the time of the accident, the trial court might have used a much longer period of time to make the calculation. So the high court affirmed the award. (*Id.* at pp. 666–667.) The majority opinion did not mention anything about present value.

---

[4] To its credit, the trial court did precisely that here.

But one should not stop reading after the majority opinion. Sometimes dissents highlight the implications of a majority decision. The defendant in *Giordano* had made a "policy" argument to the effect the Legislature had not intended criminal law restitution hearings to " 'devolve into civil trials' " (*Giordano, supra*, 42 Cal.4th at p. 662.) and that argument had some traction with Justice Kennard, who remarked that "the criminal sentencing process is ill suited to making the often exceptionally complex damage calculations that are required." (*Giordano, supra*, 42 Cal.4th at p. 667 (dis. opn. of Kennard, J.).) She noted that loss of support issues are often "exceptionally complex," and in particular feared that the majority's approach meant trial courts would now have to tackle the " 'difficult problem of translating an uncertain future stream of earnings into a present value.' " (*Id.* at p. 671.)

In that regard Justice Kennard cited a Seventh Circuit case from the early 1980's, *U.S. v. Fountain* (7th. Cir. 1985) 768 F.2d 790. (See *Giordano, supra*, 42 Cal.4th at p. 671 (dis. opn. of Kennard, J.).) *Fountain* had made the point that "a *responsible* calculation of lost future earnings" would necessarily involve, among other variables, the "correct discount rate by which to reduce the estimated future earnings to a present, lump-sum value." (*Fountain, supra*, 768 F.2d at p. 802, italics added.) Justice Kennard's general point in citing *Fountain* was that, if the majority wanted to go down the road to the consideration of lost future earnings or payments, victim restitution calculations might become more complex than she believed the Legislature might have intended. (See *Giordano, supra*, 42 Cal.4th at p. 671 ["Had the Legislature intended to require our already overburdened criminal courts to resolve these complex and typically civil issues . . . I would expect to find some evidence of this intent . . . ."].) We think Justice Kennard's concern about increased complexity in the calculation of victim restitution awards was well founded, but we think it can be overcome.

Victim restitution awards *have* become more complex, as catalogued in *People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1175 [107 Cal.Rptr.3d 895] (*Chappelone*). *Chappelone* itself held that it was an abuse of discretion for the trial court not to "discount" an inventory of stolen but already damaged goods to account for their *actual* economic value. The trial court had erred in making the restitution award based solely on the full retail value of the damaged goods. (*Id.* at p. 1175; see generally *id.* at pp. 1173–1180.)[5] Our case presents similar problems, but we do not yet see them as insurmountable.

---

[5] The merchandise at issue in *Chappelone* was a large number of items embezzled from a retail chain store by an insider. When the merchandise was recovered the store simply scanned the last retail value of the item to arrive at the claimed amount, regardless of whether the item was damaged and thus could not be sold at its full retail value. The *Chappelone* court was not unsympathetic to the "virtual impossibility" of the task, borne by the victim, of assessing each individual item. (See *Chappelone, supra*, 183 Cal.App.4th at p. 1175.) The court suggested,

## 2. The Time Value of Money

The Attorney General's characterization of the trial court's methodology as a "rational mathematical formula" to calculate Muniz's loss is untenable. While the trial court's math was fine, it did not take into account the time value of money. The court's computation failed to account for the value of a lump-sum payment over a series of fractional payments spread out over decades. The actual economic value of $246.50 a month for 24 years does not approach a $70,000 lump-sum payment. (See *Chappelone, supra,* 183 Cal.App.4th at p. 1172 ["A restitution order is intended to compensate the victim for its actual loss and is not intended to provide the victim with a windfall."].)

Suppose, for example, Muniz had taken his right to $246.50 for the rest of his life and tried to get a lump-sum payment for it.[6] Leaving aside any transaction costs or direct fees, there is no way he would receive anywhere near $70,000 for that stream of payments in the open marketplace. Any payment would be subject to some sort of discount to reflect the fact he would be receiving it all *now*. And the point of a restitution award is that the crime perpetrator is indeed responsible to pay the award *now*, which is why the award carries interest from the date of sentencing or date of loss.[7] (See Pen. Code, § 1202.4, subd. (f)(3)(G) ["Interest, at the rate of 10 percent per annum, that accrues as of the date of sentencing or loss, as determined by the court."].) That has to be factored into the award.

The *Giordano* court cited with approval (as "useful") *Canavin v. Pacific Southwest Airlines* (1983) 148 Cal.App.3d 512, 520–521 [196 Cal.Rptr. 82] for the point that a surviving spouse's economic loss is best described as the loss of *future* support (*Giordano, supra,* 42 Cal.4th at p. 665), an idea which readily translates in the case before us to Muniz's loss of future payments in

---

however, that there was a simpler approach, namely "starting" with the prepared inventory and then applying some overall discount to approximate the "true nature of the goods." (*Ibid.*)

[6] Judging from the television advertisements providing such payments has become a cottage industry.

[7] Penal Code section 1202.4, subdivision (f) creates a presumption victim restitution loss should be ascertained at "the time of sentencing," subject to the trial court's discretion to ascertain the amount of loss at another time. For purposes of this appeal, we may assume the "time of sentencing" is the time of the restitution order (Dec. 16, 2011), as distinct from the time the trial court imposed on Pangan the six-year prison sentence (June 11, 2010) from which he immediately appealed. The actual abstract of judgment, providing for both the six-year sentence *and* the $79,382.67 restitution order, was filed January 23, 2012. Calculating Muniz's losses from December 16, 2011, would have meant there were *23* years of diminished pension payments requiring discounting to present value, because at the time of sentencing one year had already been lost, and therefore no discount to present value would be needed—indeed, for that lost year not only would no discount to present value be required, but interest would have to be added to it.

the amount of $246.50 a month. And *Canavin* made exactly the point that a lump sum now, reflecting future payments, must be discounted to reflect the fact the recipient is receiving the money now. "Since the present award is to compensate for support which would only have been received in the future had decedent survived, *discounting to present value* recognizes the economic advantage of receiving a present lump sum which may be used or invested as speculatively or conservatively as the recipient chooses." (*Canavin, supra,* 148 Cal.App.3d at p. 521, italics added.)

Of course, the need to account for the time value of money regularly surfaces in civil cases involving streams of future payments. In *Roden v. AmerisourceBergen Corp.* (2010) 186 Cal.App.4th 620 [113 Cal.Rptr.3d 20], this court recently noted that a failure to account for the time value of money amounts to actuarial " 'heresy.' " (*Id.* at p. 644, quoting *Conkright v. Frommert* (2010) 559 U.S. 506, 519 [176 L.Ed.2d 469, 130 S.Ct. 1640, 1650]; see *Croucier v. Chavos* (2012) 207 Cal.App.4th 1138, 1150 [144 Cal.Rptr.3d 180] [a delay in the payment of a judgment reflects " 'actual injury' " in the form of the "lost time value of money"].) The California Supreme Court explicitly recognized the time value of money in *Salgado v. County of Los Angeles* (1998) 19 Cal.4th 629, 647 [80 Cal.Rptr.2d 46, 967 P.2d 585] (noting that because an award was to be "received now" it therefore made "sense to give some recognition to the time value of money in determining the sum the plaintiff should have available now and during the future years"). And the United States Supreme Court, in *Conkright*, recently took a federal district court to task in a pension case for adopting an interpretation of a pension plan that did not "account for the time value of money." (*Conkright, supra,* 559 U.S. at pp. 519–520 [130 S.Ct. at p. 1650] ["the District Court's approach, which does not account for the fact that respondents were able to use their past distributions as they saw fit for over 20 years, would place respondents in a better position than employees who never left the company"].)[8]

In fine, there is no escaping the time value of money. The trial court erred here in not accounting for the fact possession of money now, as distinct from the future, *is* worth something, and that something must be accounted for in order to arrive at the actual value of an economic loss.

## B. *Ineffective Assistance of Counsel*

There is no question Pangan's trial counsel waived the issue of the time value of money by failing to object to the award the trial court made. (E.g., *People v. Foster* (1993) 14 Cal.App.4th 939, 944 [18 Cal.Rptr.2d 1] (*Foster*)

[8] This case was the source of the "heresy" comment picked up in *Roden*.

[failure to object to recommended amount of restitution set out in probation report].) So we proceed directly to whether the failure amounted to ineffective assistance of counsel.

■ The elements of ineffective assistance are (1) counsel failed to act in a reasonably competent manner and (2) it was reasonably probable a more favorable determination would have ensued but for counsel's failing. (*Foster, supra,* 14 Cal.App.4th at p. 944.) Additionally, we examine (3) whether trial counsel had a reasonable tactical decision for his omission. (See *People v. Lucas* (1995) 12 Cal.4th 415, 436 [48 Cal.Rptr.2d 525, 907 P.2d 373].)

### 1. *Reasonable Competence*

■ To be sure, most people's eyes—including those of this opinion's author—glaze over on the topic of "present value," which is "accountant-speak" for recognizing the time value of money. Even so, California's statutory restitution pegs restitution awards to "economic loss" (Pen. Code, § 1202.4, subd. (a)(1))[9] and there is simply no avoiding the need to calculate a victim's actual economic loss. (See *Chappelone, supra,* 183 Cal.App.4th at pp. 1174–1175 [rejecting People's argument correct calculation was too difficult a chore].)

Moreover, the concept of present value, i.e., the time value of money, is just not all that hard. (See *In re Milspec, Inc.* (Bankr. E.D.Va. 1988) 82 B.R. 811, 815.) Lawyers whose professional business includes mastering double-the-base-term sentencing rules and the metaphysics of section 654 should be able to remember the need to discount a restitution award to present value if based on the loss or diminution of future payments. And that is particularly true given that one of the purposes of California's restitution scheme is to give crime victims an expeditious "civil remedy" for the economic losses suffered by the crime victim. (See *People v. Millard* (2009) 175 Cal.App.4th 7, 35 [95 Cal.Rptr.3d 751] (*Millard*) ["the primary purpose of a victim restitution hearing is to allow the People to prosecute an expedited hearing before a trial court to provide a victim with a civil remedy for economic losses suffered, and not to punish the defendant for his or her crime"].) For better or worse, criminal law victim restitution defense entails at least *some* acquaintance with the idea of the time value of money.

---

[9] And continues to do so after the 2012 amendments to section 1202.4, which focus on the issue of compensation. (See new Pen. Code, § 1202.4, subd. (a)(1) ["It is the intent of the Legislature that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime."].)

## 2. *Reasonably Probable More Favorable Determination*

The next consideration as far as ineffective assistance is concerned is the problem of whether the omission had any adverse impact on the client. Here it did.

In accounting for the time value of money, the trial judge would necessarily have had to arrive at a reasonable discount rate. The judge might have used a very low discount rate as a reflection of the relatively low rates of inflation and mortgage interest rates since 2008-and of course a low rate would have resulted in a higher "present value" of Muniz's lost payments. Or he might have chosen a higher rate based on other market metrics. But either way, a full value award was too high.

The Attorney General's office suggests that Pangan's defense counsel might have submitted on the tentative because the tentative represented "a good deal," given that the tentative disregarded Muniz's claim for $15,000 from the unattended prize fight. But there is nothing in the record to suggest that exclusion was an oversight or that the court would punish Pangan for bringing it up. We see no way in which Pangan's trial attorney had anything to lose by raising the need to discount the $70,000 to present value, and the Attorney General is unable to articulate one that is convincing.

## C. *Jury Trial*

The case must thus be reversed for another hearing.[10] In supplemental briefing Pangan argues the recent United States Supreme Court case of *Southern Union Co. v. United States* (2012) 567 U.S. ___ [183 L.Ed.2d 318,

---

[10] Under section 6086.7, subdivision (a)(2) of the Business and Professions Code we are required to notify the State Bar of a reversal in a judgment if it is the result of "misconduct, incompetent representation, or willful misrepresentation." There is authority indicating that criminal law ineffective assistance of counsel comes within this statute. (See *Barner v. Leeds* (2000) 24 Cal.4th 676, 689 [102 Cal.Rptr.2d 97, 13 P.3d 704].) Accordingly, pursuant to Business and Professions Code section 6086.7, subdivision (a)(2), the clerk of this court is ordered to forward a copy of this opinion to the State Bar upon return of the remittitur. Further, pursuant to Business and Professions Code section 6086.7, subdivision (b), the clerk of this court shall notify Pangan's trial counsel—who need *not* be named in this opinion—that the matter has been referred to the State Bar.

That done, it is our firm conviction that Pangan's trial counsel should receive no discipline at all for not being aware of the need to raise the time value of money to the trial court. It is the nature of the common law to progress over time and be accretive (see *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 101 [78 Cal.Rptr.2d 16, 960 P.2d 1046] (dis. opn. of Brown, J.)), and we find it particularly relevant that (a) this is the very first published case to consider the issue, (b) the issue was only raised for the first time by an appellate lawyer on appeal, and (c) the accomplished trial judge—trying very hard himself to arrive at the correct calculation—forgot about the time value of money.

132 S.Ct. 2344] (*Southern Union*), plus the more venerable *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*) and *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531] (*Blakely*), all require a jury trial on his restitution award. While we reverse the award for ineffective assistance, since a new trial is required we address the jury trial issue. (Code Civ. Proc., § 43.)

*Southern Union* involved a restitution fine of $50,000 *a day* for each day of a putative 762-day-long environmental law violation. The United States Supreme Court struck the fine down because the very fact which determined the "maximum fine" the corporate defendant faced—the number of days the violation continued—was not determined by the jury. (See *Southern Union, supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2356] ["the fact that will ultimately determine the maximum fine Southern Union faces is the number of days the company violated the statute"].)

*Apprendi* held that any fact which increases a defendant's sentence beyond the "statutory maximum" must go to the jury. (*Apprendi, supra*, 530 U.S. at p. 490 ["any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"].) And *Blakely* was a gloss on *Apprendi*, holding that the statutory maximum under *Apprendi* was the maximum sentence a judge could impose based on facts reflected in the jury verdict or admitted by the defendant. (See *Blakely, supra*, 542 U.S. at p. 303.)

■ But neither *Southern Union, Apprendi* nor *Blakely* have any application to direct victim restitution, because direct victim restitution is not a criminal penalty. As explained in *U.S. v. Behrman* (7th Cir. 2000) 235 F.3d 1049, 1054, direct victim restitution is a substitute for a civil remedy so that victims of crime do not need to file separate civil suits. It is not increased "punishment." The *Millard* decision makes the same point in regard to California law. (*Millard, supra*, 175 Cal.App.4th at p. 35; accord, *People v. Harvest* (2000) 84 Cal.App.4th 641, 645, 650 [101 Cal.Rptr.2d 135].) *Chappelone* has collected the numerous federal cases also holding victim restitution does not constitute increased punishment for crime. (See *Chappelone, supra*, 183 Cal.App.4th at p. 1184.) And we would note the restitution statute *itself* characterizes victim restitution awards as civil. (See Pen. Code, § 1202.4, subd. (a)(3)(B) [victim restitution "shall be enforceable as if the order were a civil judgment"].)

Federal courts have also rejected *Apprendi* challenges to victim restitution statutes because those statutes, like the one before us, carry no prescribed statutory maximum. (*U.S. v. Wooten* (10th Cir. 2004) 377 F.3d 1134, 1144, fn. 1 ["Mr. Wooten's *Blakely* argument fails for the same reason as his *Apprendi*

argument, which is that the amount of the restitution award does not exceed any prescribed statutory maximum."]; *U.S. v. Einstman* (S.D.N.Y. 2004) 325 F.Supp.2d 373, 382 ["As an alternative rationale, Judge Easterbrook of the Seventh Circuit held persuasively in *Behrman* . . . that a judicial finding of the amount of restitution does not violate *Apprendi* . . . because the statute that mandates an order of restitution in a case like this one . . . does not have any 'statutory maximum' that could be 'increased' by a judicial finding of the amount of loss to the victim."].)

So on remand there will be no *Southern Union-Apprendi-Blakely* right to a jury trial.

## DISPOSITION

The restitution order is reversed and remanded for recalculation to account for the time value of money. Obviously, the trial court will have to take evidence on the issue of the appropriate discount rate and calculations. We recognize this is a relatively new requirement in criminal law restitution hearings. It would be premature at this juncture to prescribe how the hearing should be conducted, or the nature of the evidence that might bear on the subject. We do note, though, that the federal bankruptcy court in *In re Milspec, Inc., supra,* 82 B.R. 811 stated that, while the relevant discount rate for calculating present value is necessarily a "judgment call," it is also a matter on which parties can often agree. (*Id.* at p. 815.)

Moore, J., and Fybel, J., concurred.