Filed 5/6/14  P. v. Luebbers CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br> v.<br><br>JOHN HAROLD LUEBBERS,<br><br>   Defendant and Appellant. | C071671<br><br>(Super. Ct. No. P11CRF0159) |

A jury found defendant John Harold Luebbers guilty of first degree murder (Pen. Code, §§ 187, subd. (a), 189; unless otherwise stated, statutory references that follow are to the Penal Code) and found true alleged sentencing enhancements based on personal use of a firearm (§ 12022.53, subd. (b)), personal and intentional discharge of a firearm (§ 12022.53, subd. (c)), and personal and intentional discharge of a firearm causing great bodily injury and death (§ 12022.53, subd. (d)).  Defendant was sentenced to prison for consecutive terms of 25 years to life for the murder and the enhancement for discharge

1

causing injury and death, that is, 50 years to life. The other enhancements were stayed pursuant to section 654. Following a hearing, the trial court ordered defendant to make restitution to Lisa Lacara, the victim's wife in the amount of $1,281,637.

On appeal, defendant contends (1) the trial court erred when it refused to instruct the jury on the lesser included offense of manslaughter, (2) his trial counsel rendered ineffective assistance in his summation when he conceded intent to kill and premeditation, and (3) the trial court abused its discretion when it failed to reduce the restitution award in accordance with the "time value" of a lump sum payment; his trial counsel rendered ineffective assistance by failing to raise the issue. We affirm the judgment.

FACTS AND PROCEEDINGS

*Prosecution Case-in-Chief*

Louisiana Schnell School is an elementary school located in Placerville. Joy Fausel was the school secretary. Dawn Cooper was the office clerk. Kara Tracy was a paraeducator (instructional aide) and food service worker. Sam Lacara was the school principal. Defendant was the janitor.

A.  *Monday, January 31, 2011*

On Monday, January 31, 2011, defendant was "in a fairly good mood." Cooper and Tracy recalled defendant joking and laughing and recounting his golf game with Lacara the previous day.

That same day, Fausel, Lacara, defendant, and Superintendent Nancy Lynch prepared for interviews that were scheduled for the next day. The interviews were for the position of night janitor. Defendant was the day janitor.

2

B.     *Tuesday, February 1, 2011*

On the morning of Tuesday, February 1, 2011, interviews for the night janitor position were conducted off campus at the district office. The interview panel included Lynch, Fausel, Lacara, and defendant. At the conclusion of the interviews, there was disagreement about who should be offered the position. Tension developed. Lynch, Fausel, and Lacara preferred one candidate, but defendant said he would not work with that person. Defendant preferred a different candidate. Later that morning, Lacara telephoned the candidates' references. To his surprise, neither candidate's references checked out.

In the early afternoon, defendant and Lacara had a confrontation outside the multipurpose room. Cooper and Fausel saw the confrontation from the main office. Defendant was yelling and pointing fingers; Lacara was angry too. They argued for five to 10 minutes.

Cooper spoke to defendant after the argument. He was visibly angry and initially waved her off but she went over and spoke with him. Defendant said that the politicians in the school district were "fucking liars" and that he was tired of them messing with things. He said, "they don't know who they are messing with but they will." Cooper said, "that's enough" and left.

Tracy spoke to defendant at the end of her kitchen shift while he was cleaning the multipurpose room. Defendant looked angry and his face was red. Defendant was angry at Lacara, Fausel, and Lynch because they did not choose the candidate he preferred. Defendant said he would "show" Lacara.

C.     *Wednesday, February 2, 2011*

Typically, Lacara would arrive at 7:30 a.m., spend time in his office, and then go to the front of the school to greet students from 8:30 a.m. to 9:00 a.m. On the morning of

3

February 2, 2011, he did not go out to greet the students. He spoke with Fausel in his office for five to 10 minutes. Then he went to a location Fausel did not know.

Around 9:40 a.m., as Tracy was walking with children to a classroom, she heard defendant and Lacara arguing in defendant's office. She heard defendant loudly say "fuck" or "fucking." She quickly moved the children away. When she got to her classroom, she saw defendant walk towards her building and then turn between two buildings and head toward a parking area. She heard him enter his truck, start the engine, and drive away. To drive from the school to defendant's residence takes approximately 11 to 13 minutes.

Later, back in the office, Lacara told Cooper and Fausel, "I've just had an argument with [defendant]. I've taken away his keys and sent him home to cool off." Lacara then went to the cafeteria to get things ready for lunch. Lacara did not say that he had fired defendant, and Cooper never heard anyone assert that defendant had been fired. Although Lacara was the principal, he did not have the authority to terminate a school district employee without using an existing process.

Sometime later, while Cooper and Fausel were in the main office, they heard Lacara's office telephone and his cellular telephone ringing in succession; the successive ringings repeated approximately four times. Then Cooper's telephone rang and she answered it. The caller was defendant. He said, "hey Coopie, is Sam there?" Defendant did not sound angry and the conversation seemed normal. Defendant wanted to speak to Lacara, so Cooper put defendant on hold and contacted Lacara in the cafeteria by way of walkie-talkie. Lacara returned to the office and spoke with defendant on the telephone. The conversation started off quiet but, as it progressed, Lacara became angry and his tone of voice elevated while responding to defendant. Lacara said that he "was not a fucking politician" and "was not a fucking liar." Fausel shut the door to Lacara's office to give him some privacy.

4

After the telephone call, Lacara left the office and went to Tracy's classroom for a scheduled classroom observation. He told the teacher for whom Tracy works that he was not going to do the observation and that he had other issues to take care of.

Around 10:30 a.m., Lacara's office telephone rang again. Then Cooper received a second telephone call from defendant. His demeanor again seemed normal. Defendant again asked to speak to Lacara. Cooper again contacted Lacara by walkie-talkie, and Lacara again returned to his office to take the call. Like the previous conversation, this one started out quiet and grew louder. Lacara said that he was "not a fucking liar, nor was he a fucking politician," nor was he "a political sellout."

Seconds after the conversation ended, defendant entered the school office through a side door. His left hand was holding a cellular telephone up to his ear. His right hand was holding a gun. Defendant walked with a brisk and purposeful stride toward and into Lacara's office. Lacara was sitting behind his desk. Defendant positioned himself in front of the desk, held the gun with two hands, and pointed the gun at Lacara. Defendant said words to the effect of, "this is for you, mother fucker." Defendant then fired three shots at Lacara. After the third shot, Fausel saw defendant leaning over Lacara's desk with his gun pointed downward.

Defendant turned around and saw Fausel. He said to her, "You fucking bitch" or "this one[']s for you, bitch" or "you're a part of this too, bitch." He started to approach her with his gun pointed at her face. Fausel started to close her door and noticed a kindergarten student sitting at a desk outside her door. She grabbed the child and said, "come with me." Then she pulled him into her office, pushed him onto the ground behind her, and slammed and locked the door.

Cooper, who sat in the main office, went under her desk. After a few moments Fausel and Cooper heard the side door open and close. Then it was quiet. Fausel crawled to the other side of her desk and telephoned 9-1-1.

5

Cooper went to Lacara's office to check on him. Lacara was lying on his stomach and forearms. He was moaning and trying to push himself up on his elbows. Cooper knelt beside him and tried to comfort him. She attempted to activate the school's lockdown alarm but it did not work. Then she placed a telephone call to all the rooms on campus. When the call ended she heard breath "whoosh" out of Lacara's body. As she stood there, she saw the first police officer arrive at the office door. Fausel opened the door for the officer.

Placerville Police Officer Duskin Franz was the first to arrive. He saw Lacara lying on the floor, unresponsive.

El Dorado County Sheriff's Detective Richard Strasser learned from radio broadcasts that defendant was the suspect. He drove to defendant's residence where he and other officers took defendant into custody. Defendant appeared lucid.

Placerville Police Officer Brody Jordan was the crime scene investigator. He collected a yellow notepad from Lacara's desk. Written on the notepad, in Lacara's handwriting, was the following:

"Opened door John I bought that toilet seat this morning.

" 'I don't give a fuck.' John

"Then he proceeded to call me a (unintelligible) fucking politician, that I had it all planned out in interviews yesterday to take the district's choice,

" 'No I didn't that is not true, after all I've been through with you, you think I'm lying.

" 'Yes you are a (unintelligible) lying politician'

"I responded with give me your keys that's out of line.

"He called the office and said what you are saying, your [*sic*] taking my job.

"(unintelligible) no (unintelligible)."

Officer Jordan saw a bullet hole in the top of Lacara's desk. An expended copper jacket round was under the desk.

Officer Jordan also collected evidence at defendant's residence. He collected a .357 magnum handgun from the master bedroom. Three expended shell casings and three live rounds were found in a trash can in the garage. Additional unfired ammunition was found in a small safe in the master bedroom. The shell casings in the trash can had the same manufacturing markings as the rounds found inside the safe. The round found in Lacara's office was the same bullet type as the other ammunition.

Criminalist Robert Wilson examined the handgun collected from defendant's residence. It did not have any malfunctions. The gun had fired the three expended shell casings found in the trash can.

Dr. Stephany Fiore, a forensic pathologist, performed an autopsy on Lacara. She found three bullet wounds: one nonfatal, one probably fatal, and one definitely fatal.

*Defense*

The defense rested without presenting evidence or testimony.

DISCUSSION

I

*Jury Instruction on Manslaughter*

Defendant contends he was denied his rights to due process of law and a fair trial because the trial court refused his request to instruct the jury with CALCRIM No. 570 on voluntary manslaughter. He argues there was sufficient evidence of reasonable provocation and that he acted under the heat of passion without sufficient time to cool off.

Following the evidentiary portion of the case, defense counsel argued there was sufficient evidence of provocation and heat of passion "by virtue of the keys being taken. The keys being taken I think would lead any reasonable person to think that they would be fired or looking at being terminated. You don't take keys away from someone unless

7

that's what your intention would be." Counsel argued that, following two days of heated arguments with Lacara, it was reasonable for defendant "to have assumed he was going to be terminated, maybe not that day, but taking of the keys; you don't take someone's keys and send them home expecting them to come back to work." Counsel asked the court to instruct the jury with CALCRIM No. 570, which says:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1. The defendant was provoked;

"2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND

"3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather

8

than from judgment.

"If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

Defense counsel made an offer of proof regarding testimony by defendant's wife about the financial constraints that they were under.

The prosecutor responded that there was insufficient evidence to support the instruction. The trial court agreed, finding the evidence "doesn't even come close to the substantial evidence that would be required to give this voluntary manslaughter instruction." The court believed "adequate provocation" was provocation that would "arouse homicidal conduct in an ordinary person of -- you know, a person of ordinary -- ordinarily reasonable person, sober person, to cause them to retrieve a pistol and engage in homicidal conduct."

"A trial court must instruct on all lesser included offenses supported by substantial evidence. [Citations.] The duty applies whenever there is evidence in the record from which a reasonable jury could conclude the defendant is guilty of the lesser, but not the greater, offense. [Citations.] That voluntary manslaughter is a lesser included offense of murder is undisputed. [Citations.]" (*People v. Duff* (2014) 58 Cal.4th 527, 559-564.)

"Heat of passion, which . . . reduces murder to voluntary manslaughter, arises when the defendant is provoked by acts that would 'render an ordinary person of average disposition "liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment" ' [citation] and kills while under the actual influence of such a passion [citation]. . . . [I]f substantial evidence supported [this] theory, the trial

9

court was obligated to agree to instruct on voluntary manslaughter." (*People v. Duff, supra,* 58 Cal.4th at pp. 559-564.)

The provocation need not be so severe that the ordinary person of average disposition would be moved to kill. (*People v. Beltran* (2013) 56 Cal.4th 935, 949 (*Beltran*).) "[S]ociety expects the average person not to kill, even when provoked. . . . However, if one *does* kill in this state [of mind], his punishment is mitigated. Such a killing is not justified but *understandable* in light of 'the frailty of human nature.' [Citation.] The killing reaction therefore is the *extraordinary* reaction, the unusual exception to the general expectation that the ordinary person will not kill even when provoked." (*Ibid.*) "Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*Ibid.*; original italics.)

"[P]rovocation is sufficient not because it affects the quality of one's thought processes but because it eclipses reflection. A person in this state [of mind] simply reacts from emotion due to the provocation, without deliberation or judgment. If an ordinary person of average disposition, under the same circumstances, would also react in this manner, the provocation is adequate." (*Beltran, supra,* 56 Cal.4th at p. 950.)

The trial court believed, contrary to *Beltran*, that "adequate provocation" was provocation that would "arouse homicidal conduct in an ordinary person of -- you know, a person of ordinary -- ordinarily reasonable person, sober person, to cause them to

10

retrieve a pistol and engage in homicidal conduct." The court's use of this incorrect standard did not prejudice defendant because there was not sufficient evidence to satisfy the proper standard. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) As we explain, there was insufficient evidence that Lacara's actions would have eclipsed the reflection of an ordinary person of average disposition under the same circumstances. (*Beltran, supra,* 56 Cal.4th at p. 950.)

The parties disagree as to the nature of those circumstances. Defendant claims the relevant provocation was the termination of his employment. The People counter that it is speculative whether Lacara *in fact* fired defendant. Thus, the People claim the relevant provocation was the "disagree[ment] about a public employment decision regarding a night janitor," followed by defendant repeatedly swearing at Lacara and disparaging his character, and followed ultimately by Lacara taking defendant's keys and sending him home to cool off.

But, as to provocation, the evidence showed more than mere disagreement and argument. There is no suggestion that school district policy entitled defendant, as day janitor, to refuse to work with the night janitor. The day before the shooting, defendant had refused to work with the candidate preferred by the majority of the interview panel. We thus assume without deciding that, because the "disagree[ment]" had escalated into insubordination, defendant reasonably could believe Lacara's taking of his keys would culminate in the termination of his employment. Our assumption is consistent with Lacara's note that defendant had stated, "your [*sic*] taking my job."

Nevertheless, there was no substantial evidence that Lacara's taking of defendant's keys, under circumstances suggesting impending termination of employment, caused defendant to "simply react[] from emotion due to the provocation, without deliberation or judgment." (*Beltran, supra,* 56 Cal.4th at p. 950.) Defendant claims his situation was more emotional than a "mere firing" because it was a "betrayal by a friend" who inferentially "would have been acutely aware of" defendant's financial distress. But

11

it is speculative whether these strong emotions caused defendant to act without deliberation or judgment. (*People v. Babbitt* (1988) 45 Cal.3d 660, 682 [evidence that produces only *speculative* inferences is *irrelevant* evidence].) Adequate provocation as an element of voluntary manslaughter must be demonstrated and cannot be left to speculation. (*People v. Gaulden* (1974) 36 Cal.App.3d 942, 951 (*Gaulden*).)

Defendant claims his acting without deliberation or judgment can be inferred from the fact that witnesses who heard him speak just before the shooting described him as "incoherent." Cooper testified on direct examination: "Most of what he said was not coherent. He said -- if I remember correctly that he said, you know, this is for you or something to the effect. That this is for you, mother fucker."

On cross-examination, Cooper was asked, "And you said that most of what [defendant] did say was not coherent"; she answered, "It was not coherent." Neither counsel clarified whether the "incoherent" statements were the ones Cooper recited in her testimony. The recited statements do not suggest that defendant acted without deliberation or judgment. The record demonstrates no other incoherence, and we cannot speculate whether other incoherent statements were made. (*Gaulden, supra,* 36 Cal.App.3d at p. 951.)

Witness Fausel recalled that defendant was shouting, but she could not remember his words due to the stress of the event. Her testimony does not suggest that defendant was acting without deliberation or judgment.

Defendant claims the telephone conversations with Lacara in the hour prior to the shooting would have "exacerbate[d]" rather than "soothe[d]" his "high emotions," in that Lacara had been heard to be angry and yelling. But even if the conversations heightened the emotion, there was no evidence that they caused defendant to act without deliberation or judgment.

In any event, there was no substantial evidence -- or indeed any evidence -- that "an ordinary person of average disposition" would have *reacted* with his reason and

12

judgment obscured. (*Beltran, supra,* 56 Cal.4th at pp. 949-950.) Although the anticipated termination of defendant's employment was more severe than "a negative evaluation from a supervisor" (*id.* at p. 950) or a refusal of employment as a laundry clerk (*Gaulden, supra*, 36 Cal.App.3d at p. 952), it was not so severe as to cause an ordinary person to react in the requisite manner. The trial court properly refused defendant's request to instruct the jury with CALCRIM No. 570.

## II

### *Defense Counsel's Concession of Intent to Kill*

Defendant contends his trial counsel rendered ineffective assistance, and "effectively abandoned" defendant, in his summation when he conceded defendant's "guilt of second degree murder, conceded intent to kill, implicitly conceded premeditation, and failed to argue the facts and law to support his chosen theory."

In his summation, defendant's trial counsel argued as follows:

"[A]s I stated in my opening statement to you last week, yes, [defendant] with the intent to kill went to Mr. Lacara's office and killed him. He did. That was a surprise maybe to some of you, but he did do that. But I just don't believe the People have proven beyond a reasonable doubt that it was with premeditation and deliberation.

"I was not able to keep my promise to you and I apologize for that. I told you this case was about one thing and that was whether or not [defendant] had malice aforethought when he entered the office.

"Based on the evidence presented, it appears [defendant] did have malice aforethought in this matter at the time he entered Mr. Lacara's office. But, again, however, what he did not have was the premeditation and the deliberation. I believe clearly this is a willful act, I don't think there's much disputing that.

"But the evidence does show that [defendant's] actions I believe were made rashly, impulsively and without careful consideration.

13

"I mentioned to you in opening that sometimes we stand so close to a painting we don't see the big picture. [The prosecutor] is a very good prosecutor. And in living in El Dorado County you are very lucky to have him, but he's focusing on this argument over hiring a night janitor. I don't believe that has anything to do with the killing. I believe the evidence is and -- well, let me back up.

"[The prosecutor] in his closing his theory appears to be it's all based on this argument starting the day before on Tuesday. We heard testimony that Mr. Lacara and [defendant] played golf on Sunday, and Monday everything was fine. Tuesday they go to the hiring meetings. I believe we had Mr. Lacara, Ms. Fausel, [defendant] and the person by the name of Nancy Lynch, which [*sic*] at the time was the school district superintendent. The evidence we heard was everything was fine. It was very cordial. There was some letting off some steam with [defendant] in the afternoon when he spoke to Ms. Tracy and Ms. Cooper. If it was really over -- it being the killing of Mr. Lacara -- if it was really over the hiring process and my client had all this time to premeditate and deliberate and think about it, wouldn't he have been waiting for Mr. Lacara right when he comes -- or right when he arrived at school? That's not what happened. It took another argument in [defendant's] office, according to Ms. Tracy. It took many phone calls. It took the taking away of the keys, which is the biggest fact in this case.

"[Defendant] was the janitor, the daytime janitor, full-time janitor. Without his keys, he's not the janitor anymore.

"So I don't believe this disagreement of who they are hiring for the night janitor has anything to do with this argument. In taking the keys of the janitor, we don't know where he went. We did hear testimony he left. Gun could have been with him the whole time. Gun could have been in the office.

"We do have a stipulation, [the prosecutor] and I. You will get the stipulation that one of the bullets, a 38 was located in his office.

14

"There was no evidence presented whatsoever that [defendant], other than speculation, we can't go into his mind, no evidence that he reflected at all. The keys were taken. He was told to go home and cool off. That's how heated he was. Even Mr. Lacara noticed how heated he was. The arguments were all heated, but again, I don't believe the arguments have anything to do with this.

"Now, we heard testimony -- strike that. We went through all the testimony.

"We have a willful act, yes. But is it deliberate and premeditated? [The prosecutor] went through what the law is basically on those issues, I'm going to do it a little bit more.

"Deliberate. Again, I think willfulness we have. We have an intentional act. I don't think there's much dispute there. But deliberate means one that [is] arrived at or determined upon as the result of careful thought and weighing of considerations for and against the proposed course of action and having those consequences of killing in mind.

"We just heard no evidence of that. Yes, he came in. We don't exactly know the time. It appears to be 30, 35, maybe 40 minutes from when he was told to go home and cool off after taking the keys. The reflection must be substantially more than the mere intent to kill. Because we have that here, we do have an intent to kill, unfortunately.

"Premeditated means he considered it beforehand. Again, [the prosecutor] appears to be focusing on this argument about hiring the night janitor. It's not to replace him. There would be no reason for him to be thinking of killing anybody over hiring a night janitor.

"Yes, I'll show them, they don't know who they are messing with. He didn't kill anybody else. . . . The argument over the night janitor isn't what this is about. This is my client's belief that he lost his job. Mr. Lacara even wrote the day[']s events from that morning on his pad of paper.

"And again, premeditation can occur in a brief period of time. There is no time limit. No bright line rule you have to think about it for five minutes. If you think about it

15

for four minutes 30 seconds, it's not premeditation. There is no time. But the true test is not the duration of time as much as it is the extent of reflection. And that is what we heard no evidence of, any reflection. Okay.

"The only, I guess, way you get to that is if you do believe this is all over the hiring of a night janitor [defendant] may have disagreed with.

"Now, I would like for you to pay attention, pay very close attention, please -- I will wait. Please pay very close attention to all the jury instructions because they are all very, very important.

"But I would really like for you to pay attention to numbers 224, 359, 522. I'm sorry, 521 and 522. Again, every one is important.

"I would like to remind all of you, please, this is very, very important, do not forget your promise to [defendant], to the Court, to [the prosecutor], to myself, that you will not hold it against [defendant] for not testifying. And that you will hold [the prosecutor] to that burden of proof that he must prove every element; and premeditation and deliberation is an element of first degree murder. Please hold him to that burden of proof.

"And as [the prosecutor] did point out on his closing, this abiding conviction. Everybody's got their own version of that I guess. But [the prosecutor] -- I've used his example as well. If I come to you 15 years from now and knock on your door, before you slam it on me, I will try to get one question in, and that will be do you still feel right about your decision in this case? And if you do, that is your abiding conviction. It is.

"But proof beyond a reasonable doubt is a very, very high standard. Even if you think he had premeditation and deliberation, that's a not guilty of first. Even if you highly suspect he had premeditation and deliberation, it's a not guilty. It's only proof beyond a reasonable doubt.

"I thank you for your time. I know you will do the right thing and come back with a guilty verdict on second degree murder. Thank you."

" ' "[I]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citation.]  Second, he must also show prejudice flowing from counsel's performance or lack thereof.  [Citation.]  Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'  [Citations.]"  [Citation.]' " (*People v. Avena* (1996) 13 Cal.4th 394, 418, footnote omitted.)

" ' "[If] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.'  [Citations.]  A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding.  [Citations.]" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

Defendant's trial counsel was not asked why he conceded second degree murder and focused his argument on the absence of premeditation and deliberation.  Because there was no dispute as to the fact of death or defendant's identity as the shooter, no claim of justifiable homicide, and, as we have explained (part I, *ante*), no substantial evidence of manslaughter, a verdict of guilty of second degree murder was the only outcome remaining that would have been favorable to defendant.  In short, counsel's goal by this point in the proceedings, given the evidence and the court's ruling on a voluntary manslaughter instruction, was quite understandably to do what he could to avoid a verdict of first degree murder.  Admitting what he had to admit given the state of the evidence was a perfectly reasonable tactic with the jury, in part because it lent credibility to his argument overall.  Because there could be a satisfactory explanation for counsel's concession, the matter is more appropriately addressed via habeas corpus.

17

Defendant complains that his trial counsel "implicitly conceded premeditation" when he told the jury that defendant "with the intent to kill went to Mr. Lacara's office and killed him." Defendant claims this statement implies premeditation because it concedes he "formed the intent to kill *before* going to Lacara's office." (Original italics.) But trial counsel went on to argue that defendant's "actions I believe were made rashly, impulsively and without careful consideration." Counsel's argument tracked CALCRIM No. 521, "First Degree Murder (Pen. Code, § 189)," which told the jury that "[t]he length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." Under these instructions, counsel's statement that defendant formed the intent to kill before going to Lacara's office did not concede premeditation or first degree murder.

Defendant claims trial counsel was ineffective in that he argued the issue of provocation (which would reduce the murder from first degree to second degree) only by reference to numbers that did not appear on the written jury instructions. After asking the jury to "[p]lease pay very close attention to all the jury instructions because they are all very, very important," trial counsel added, "I would really like for you to pay attention to numbers . . . 521 and 522. Again, every one is important." The numeric references were to CALCRIM No. 521, quoted in part above, and CALCRIM No. 522, "Provocation: Effect on Degree of Murder."

Defendant notes that the jury had no way to correlate trial counsel's numbers to the unnumbered written instructions furnished by the court. But it is not reasonably probable that the jury reacted to its inability to locate "521 and 522" by concluding, contrary to trial counsel's argument, that all or any portion of the court's instructions were not "very, very important." Under these circumstances, the inartful numeric

18

references would not have caused any reasonable juror to disregard or overlook any "very, very important" instruction. No prejudice is shown. (*People v. Avena, supra,* 13 Cal.4th at p. 418.)

Defendant also challenges this portion of trial counsel's argument: "If . . . the killing of Mr. Lacara . . . was really over the hiring process and [defendant] had all this time to premeditate and deliberate and think about it, wouldn't he have been waiting for Mr. Lacara right when he comes -- or right when he arrived at school? That's not what happened. It took another argument in [defendant's] office, according to Ms. Tracy. It took many phone calls. *It took the taking away of the keys, which is the biggest fact in this case.*" (Italics added.)

Defendant complains that trial counsel "did not tell the jury why" Lacara's taking of defendant's keys "was important or what use they could make of it." But counsel's remarks make plain that, because the impetus for the killing was the taking of the keys and not the hiring process the previous day, defendant did not have "all this time to premeditate and deliberate and think about" killing Lacara. Trial counsel's argument invited the jury to *use* the taking of the keys for the important purpose of distinguishing between first and second degree murder. No ineffective assistance is shown.

III

*Restitution Award*

Defendant contends the trial court's restitution award constituted an abuse of discretion in that (1) the court failed to calculate the portion of Lacara's future income to which his surviving spouse was entitled for her support, and (2) the court failed to reduce the restitution award to reflect the time value of money. Defendant claims his trial counsel's failure to raise the time value issue by arguing for a decreased restitution award constitutes ineffective assistance. None of these points has merit.

19

A restitution hearing was held in January 2013. The prosecution requested restitution to Lacara's widow, Lisa; Lacara's sister, Lynne Centofanto; and the Victim Compensation Board, pursuant to section 1202.4. This appeal involves only the award to Lisa, who we refer to her by her first name for reasons of clarity.

The restitution request for Lisa was based primarily upon a professional report that estimated the employment-based financial loss to Lisa due to Lacara's death. The report's estimates were based on assumptions of 2.0 percent, 2.5 percent, or 3.0 percent raises during Lacara's lost working years, 2.0 percent raises during his lost pension years, increases to Lacara's pension had he continued his employment, Lisa's inability to work while grieving, and health care benefits during Lacara's lost working years. The totals ranged from a low of $1,281,637 (ultimately selected by the court) to a middle of $1,463,797 and a high of $1,659,544.

Citing *People v. Giordano* (2007) 42 Cal.4th 644 (*Giordano*), defendant's trial counsel objected that the "surviving spouse's economic loss is not simply the wages or the income that the deceased spouse would have earned but for the death" but is limited to "her share of" the decedent's earnings. He reasoned that Lacara "was the head of the household. But, again, his income provides support for the entire household. She's going to only be entitled to what she would be entitled to of his earnings."

Defense counsel did not demonstrate the portion of Lacara's earnings to which Lisa would be entitled. Nor did he object that any restitution order must be adjusted for the time value of money.

At the hearing, the trial court praised the report as "one of the more well laid-out Victim Impact Statements that I've dealt with." The court stated that the report authors had "taken into account, I'll say, pretty much everything." After noting the three numbers, the court said, "I picked the lower one. While I would say based on the State's economic climate over the next few years, that may be an overly optimistic number, but taking all things into consideration, the Court finds the $1,281,637 amount is a very

20

conservative estimate of the lost income, lost pension, her personal losses, the benefits, et cetera."

The California Constitution provides that all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer. (Cal. Const., art. I, § 28, subd. (b)(13)(B).) Section 1202.4 implements the constitutional provision, providing in relevant part: "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims." (§ 1202.4, subd. (f).) The restitution order "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct." (§ 1202.4, subd. (f)(3).) "The court shall order full restitution unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record. A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution order, nor shall inability to pay be a consideration in determining the amount of a restitution order." (§ 1202.4, subd. (g).) Put differently, inability to pay does not justify reducing a restitution order, either in part or all the way to zero. A "victim" for purposes of section 1202.4 includes the "immediate surviving family of the actual victim" and a "person who has sustained economic loss as the result of a crime" and was the spouse or child of the victim at the time of the crime. (§ 1202.4, subds. (k)(1), (k)(3)(A).)

A surviving spouse "does not step into the shoes of decedent to recover his future losses"; rather, the spouse and family members recover the economic losses that they incurred personally. (*Giordano, supra,* 42 Cal.4th at p. 657.) When a spouse is killed, "the economic loss incurred by a surviving spouse is the loss of future economic support due to the spouse's death." (*Id*. at pp. 659, 662.)

21

"At a victim restitution hearing, a prima facie case for restitution is made by the People based in part on a victim's testimony on, or other claim or statement of, the amount of his or her economic loss. [Citations.] 'Once the victim has [i.e., the People have] made a prima facie showing of his or her loss, the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim. [Citations.]' [Citation.]" (*People v. Millard* (2009) 175 Cal.App.4th 7, 26 (*Millard*).)

We "review the trial court's restitution order for abuse of discretion. [Citations.] . . . Under this standard, while a trial court has broad discretion to choose a method for calculating the amount of restitution, it must employ a method that is rationally designed to determine the surviving victim's economic loss. To facilitate appellate review of the trial court's restitution order, the trial court must take care to make a record of the restitution hearing, analyze the evidence presented, and make a clear statement of the calculation method used and how that method justifies the amount ordered." (*Giordano, supra,* 42 Cal.4th at pp. 663-664.) On appeal, the trial court's order is presumed correct. (*Id.* at p. 666.)

Defendant's trial counsel argued that "the legislature did not intend to authorize criminal sentencing courts to order direct restitution for" "anticipated economic support." Counsel argued that, in lieu of restitution, the surviving spouse could resort to "a civil action for wrongful death" or "an application to the Restitution Fund." This argument had been rejected in *Giordano,* which had agreed in principle that, although section 1202.4 "does not itself provide guidelines for calculating the economic loss that a surviving spouse incurs," the spouse is entitled to receive " 'the amount of the surviving spouse's demonstrated loss of support.' " (*Giordano, supra*, 42 Cal.4th at pp. 664, 666.)

Although the burden had shifted to him to do so (*Millard, supra,* 175 Cal.App.4th at p. 26), defendant's trial counsel did not demonstrate what portion of Lacara's future wages should accrue to Lisa for her support. Although trial counsel argued that there should be *some* reduction from the recommended amount, he did not attempt to

22

demonstrate what that reduction should be. In failing to make any reduction, the trial court simply decided the issue adversely to the party who ultimately bore the burden. Even on appeal, defendant does not identify the dollar amount or percentage of reduction that should have been sought. No error is shown.

Defendant next contends that, in authorizing the award, the trial court took "into account the type of non-economic damages that would be available in a civil suit." He claims the court relied on "Lacara's standing in the community, pain and suffering, and loss of consortium," which "constituted an abuse of discretion." We disagree.

After noting that the professional analysis offered three alternative economic scenarios, the trial court stated, "I picked the lower one. While I would say based on the State's economic climate over the next few years, that may be an overly optimistic number, but taking all things into consideration, the Court finds the $1,281,637 amount is a very conservative estimate of the lost income, lost pension, her personal losses, the benefits, et cetera. [¶] While I know she's not just simply entitled to, you know, all of the wages, I mean, all of us that have been around divorce courts know that there's community property issues and things of that nature, but this also does not -- for example, in a wrongful death suit, there would be pain and suffering, loss of consortium, et cetera. [¶] So I think this is a very conservative number considering the information that was adduced at trial, concerning Mr. Lacara and his standing in the community [and] his standing with his family." (Italics added.)

Viewed most favorably to the judgment, the trial court's comments do not suggest that the restitution award improperly compensated Lisa for noneconomic items such as pain and suffering and loss of consortium. Rather, the court appears to acknowledge that Lisa could recover more in a civil suit than she would receive in criminal restitution. To the extent the court suggested that the inability to compensate Lisa for noneconomic items somehow justified the court's failure to reduce Lacara's salary to an amount appropriate for Lisa's support, any error was harmless in light of defendant's failure to

23

"demonstrate that the amount of the loss is other than that claimed by" Lisa in the professional analysis. (*Millard, supra,* 175 Cal.App.4th at p. 26.)

Defendant complains that the trial court "failed to take into account the time value of money and reduce the award accordingly." In his view the restitution award should have been "discounted to reflect the time value of money and the value of receiving a lump sum present payment for future losses." Defendant further contends his trial counsel rendered ineffective assistance when he failed to object on this ground in the trial court.

Defendant's argument is based on *People v. Pangan* (2013) 213 Cal.App.4th 574, 576, 582 (*Pangan),* which reasoned as follows: "While the trial court's math was fine, it did not take into account the time value of money. The court's computation failed to account for *the value of a lump-sum payment* over a series of fractional payments spread out over decades. The actual economic value of $246.50 a month for 24 years does not approach a $70,000 lump-sum payment. (See [*People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1172] ['A restitution order is intended to compensate the victim for its actual loss and is not intended to provide the victim with a windfall.'].)" (*Pangan, supra*, at p. 581; italics added.) *Pangan* added: "Any payment would be subject to some sort of discount to reflect the fact he would be receiving it all *now*. And the point of a restitution award is that the crime perpetrator is indeed responsible to pay the award *now*, which is why the award carries interest from the date of sentencing or date of loss. [Citation.] That has to be factored into the award." (*Id*. at p. 581, footnote omitted.)

As to this argument, defendant overlooks the fact that Lisa did not receive a present lump sum payment of $1,281,637 for damages that she would suffer over future years. Normally present value calculations are only required where damages sustained in future years are awarded at the present time. The amount awarded is presumed to grow at a certain interest rate (as determined by the trier of fact) over time, so the *present* value of that award is something less than the total damages sustained over future years.

Here Lisa, as far as this record indicates, did not receive a present payout of $1,281,637. Her restitution money, or a portion of it, will be received only with the passage of time.

In any event, defendant forfeited the time value issue by failing to assert the fact-bound claim at the restitution hearing. (*People v. Scott* (1994) 9 Cal.4th 331, 354.) The record on appeal sheds no light on why trial counsel failed to raise the issue, and he was not asked for an explanation. But trial counsel could have believed that the trial court's election of the lowest of the three suggested scenarios was very advantageous to defendant; thus, counsel could have elected to refrain from arguing for a further reduction that might have prompted the prosecution to advocate for the middle or upper scenario. The claim of ineffective assistance is more appropriately decided in a habeas corpus proceeding. (*People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267.)

DISPOSITION

The judgment is affirmed.


                                                 HULL , J.


We concur:


BLEASE , Acting P. J.


HOCH , J.

25