Filed 1/12/16  P. v. Salas CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RYAN ANTHONY SALAS,<br><br>    Defendant and Appellant. | A138588<br><br>(Humboldt County<br>Super. Ct. No. CR1201698) |

Appellant Ryan Anthony Salas was convicted, following a jury trial, of first degree felony murder, possession of a firearm by a felon, conspiracy to commit robbery, and conspiracy to commit burglary.  The jury also found true both a felony-murder special-circumstance allegation and several other enhancement allegations.  On appeal, he contends (1) defense counsel was ineffective because he did not request an instruction on voluntary intoxication or argue that theory to the jury; (2) the trial court erred when it failed to instruct sua sponte on attempt in connection with the predicate felonies for felony murder; (3) the trial court erred when it failed to instruct on the nexus requirement for felony murder or, in the alternative, defense counsel was ineffective for failing to request such an instruction; (4) the trial court erred when it failed to instruct sua sponte on the lesser-included offense of second degree murder or, in the alternative, counsel was ineffective for requesting that the court not so-instruct the jury; (5) the trial court improperly instructed the jury on the felony-murder special-circumstance allegation; and (6) the cumulative effect of the errors raised on appeal requires reversal of the judgment.

1

In a petition for writ of habeas corpus (habeas petition), appellant further contends defense counsel was ineffective for (1) failing to investigate or develop evidence regarding the defense of voluntary intoxication; (2) failing to use available evidence of voluntary intoxication as a defense at trial or as a basis for requesting an instruction on voluntary intoxication; (3) failing to request an instruction on the nexus requirement for felony murder; (4) persuading the trial court not to instruct on the lesser-included offense of second degree murder. He also argues that the cumulative effect of counsel's deficient performance requires reversal of the judgment.

We conclude defense counsel was ineffective for requesting that the court not instruct the jury on the lesser-included offense of second degree murder and the court erred in failing to instruct on attempt in connection with the predicate felonies for felony murder. We shall therefore reverse the first degree murder conviction and felony-murder special-circumstance true finding. As we shall explain (see pt. II, *post*), we need not address the merits of the other issues raised on appeal or in appellant's habeas petition, which we shall deny in a separate order.

## PROCEDURAL BACKGROUND

On May 14, 2012, appellant and codefendant Nathan Nix, Jr., were charged by amended information with the murder of Jack Sovereign (Pen. Code, § 187, subd. (a)—count 1);[1] possession of a firearm by a felon (former § 12021, subd. (a)(1) [now § 29800, subd. (a)[2]]—count 2 (appellant); count 3 (Nix)); conspiracy to commit robbery (§§ 182, subd (a)(1)/211—count 4); conspiracy to commit burglary (§ 182, subd. (a)(1)/459—count 5); criminal threats (§ 422—count 6); and dissuading a witness from reporting a crime (§ 136, subd. (b)(1)—count 7). As to counts 1, 4, and 5, the information alleged that appellant personally used a firearm (§§ 1203.06, subd. (a)(1), 12022.53, subd. (b)),

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Section 12021 was repealed as of January 1, 2012. (Stats. 2010, ch. 711, § 6, operative Jan. 1, 2012.) The successor statute, section 29800, subdivision (a), continues former section 12021, subdivision (a), without substantive change. (Cal. Law Revision Com. com. to § 29800, West's Ann. Pen. Code.)

2

and that he personally and intentionally discharged a firearm (§ 12022.53, subd. (c), (d)). As to count 1, the information further alleged that the murder was committed during the commission of a robbery or attempted robbery, a special circumstance pursuant to section 190.2, subdivision (a)(17). As to counts 4 and 5, the information alleged that appellant personally inflicted great bodily injury on Sovereign (§ 12022.7, subd. (a)). Finally, as to all counts naming appellant, the information alleged that he had a prior strike conviction (§ 667, subd. (b)-(i)).

During trial, on July 30, 2012, Nix pleaded guilty to voluntary manslaughter. On August 14, the trial court granted appellant's unopposed motion to dismiss counts 6 and 7.

On August 17, the jury found appellant guilty of counts 1, 2, 4, and 5, and further found that he had personally used a firearm in the commission of the crimes, but found that he did not intentionally discharge the firearm. The jury also found the special circumstance and great bodily injury allegations to be true. On September 4, 2012, in a separate court trial, the court found the prior strike allegation to be true.

On April 25, 2013, the trial court sentenced appellant to life in prison without possibility of parole plus a determinate term of 16 years.

On April 30, 2013, appellant filed a notice of appeal.

## FACTUAL BACKGROUND

This case arises from the shooting death of Jack Sovereign in the early morning of June 1, 2010, while he was sitting in his truck in the driveway of a home on Santa Clara Street in Eureka, which was owned by Dwayne Fields.

### Prosecution Case

Kelly Gregorio testified that, at the time of the shooting, she was living in Dwayne Fields's home on Santa Clara Street. Fields was a friend with whom Gregorio had lived "off and on" for over 15 years. Gregorio's sister, Amy Josephson, had moved into the home about 10 days earlier. In May 2010, Gregorio, Josephson, and Fields were all using methamphetamine, although at the time of trial, Gregorio had not used methamphetamine for 15 months.

3

On May 31, 2010, Jack Sovereign, a friend of Gregorio's, came to Fields's house between 10:00 and 11:00 p.m. Sovereign and Gregorio listened to music and spent time together in Gregorio's bedroom. Shortly before he left the house, Sovereign injected methamphetamine. Gregorio and Josephson had used methamphetamine earlier in the day. About 3:15 a.m. on June 1, Gregorio walked Sovereign to his truck, which was parked in the driveway; the driveway was illuminated by security lights. Sovereign got into the driver's seat of the truck and turned on the engine. He said he thought someone had been in the truck because the windshield wipers were on, the radio was on, and the driver's seat was kicked back. Sovereign seemed concerned.[3] Sovereign reached down under the seat, saying something about keys being down there, and then asked Gregorio to go get him a plastic bag.

Gregorio went back to the house and returned a short time later with a plastic bag. As she walked up to the truck she saw "Stompers" coming toward them holding a shotgun. At trial, she identified appellant as the person she knew as "Stompers." She had only met him a couple of times before, but was familiar with him. She had seen him when he had twice come to her house the day before, on May 31, 2010. When he approached with the shotgun, he was dressed in dark clothing and had a bandana over part of his face; she recognized him by his eyes. Gregorio spun around and ran back to the house, screaming for her sister to call 911. Before she got to the house, she turned around and saw Sovereign and appellant "wrestling, struggling." Sovereign was still in the driver's seat and appellant was inside the driver's door. She heard Sovereign say, "What the fuck. God damn." She then heard a gunshot.

Gregorio went into the house and locked the door. Josephson was holding the phone, but Gregorio did not realize Josephson was already on the phone with the 911 operator, and therefore dialed 911 again. She and Josephson then went out to the truck and saw Sovereign, who was still sitting in the driver's seat, but was leaning over the

---

[3] On cross-examination, Gregorio said she thought she had seen someone standing near Sovereign's truck earlier, when she looked at a security monitor in her bedroom.

center console into the passenger seat. She also saw blood and a gunshot wound. Gregorio stood outside the truck while Josephson was in the passenger seat; they tried to hold Sovereign's head up. Josephson was also on the phone with the 911 operator.[4]

After medical personnel and law enforcement arrived, Gregorio and Josephson "were still pretty freaked out." The officers told them to go back inside the house. After Josephson walked out onto the grass a couple of times, the officers got upset and put them into the back of a police car.

Gregorio identified photographs of Katrina Inong, whom she knew as "Trinie," and Sonia Hunsucker. They had come to her house on May 30 and May 31, 2010, in a Toyota 4Runner. During the May 30 visit, Gregorio saw both women go into Fields's room and talk to him. On May 31, Inong and Hunsucker returned to the house in the late afternoon and again talked to Fields in his room. Gregorio and Josephson were also at the house, along with a man named Skip. Later that day, Inong and Hunsucker returned again with appellant. They came into Gregorio's room and Inong introduced appellant, saying, "This is Stompers." They then went back into Fields's room and talked to him. Later, just before it got dark, as Inong, Hunsucker, and appellant were leaving the house, Sovereign arrived. They probably passed each other in the hallway because Sovereign asked if that was "Stompers and Trinie" who had just left. Sovereign stayed for a few minutes and then left. He returned a couple of hours later and stayed until he left for the final time.[5]

Gregorio testified that Fields had no animosity toward Sovereign. On May 31 to June 1, 2010, Fields had a safe in his room, inside his closet.

---

[4] A recording of Josephson's 911 call was played for the jury. In it, she told the 911 operator that "someone was already inside of [Sovereign's] truck, he . . . got out of the truck, and they ran or they drove off. We don't know which one 'cause we weren't out here when he left." She also said, "we have no idea who was in the truck with him."

[5] Skip left the house five or ten minutes before Gregorio and Sovereign walked outside. Fields left the house a couple of hours earlier and, according to Gregorio, "[a]t that time of night, he always went to the casino."

On cross-examination, Gregorio acknowledged that she had smoked methamphetamine nearly every day for the years she lived at Fields's house. However, neither Fields nor Sovereign were supplying her with methamphetamine in the three months before June 1, 2010, and she denied that Fields was dealing drugs from his home. Gregorio acknowledged that she had testified at the preliminary hearing that Fields had left the house 15 minutes before Sovereign was shot, but in fact he left "quite a while" before the shooting. Fields drove a black Corvette. He also had an older truck that was parked in the driveway in front of Sovereign's truck at the time of the shooting. Everyone at the house that night had been using methamphetamine. Skip, who left the house five minutes before the shooting, had been trying to get Gregorio's sister, Amy Josephson, to come with him.

Before he left the house for the last time, Sovereign told Gregorio he was going home to strip parts off of a stolen motorcycle. When she first spoke with officers early on June 1, 2010, she told them she thought the shooting was connected to the stolen motorcycle. Gregorio acknowledged that, at the preliminary hearing, she had testified that she did not recognize the person she saw approaching Sovereign's truck because she was focused on the gun. She did not mention appellant until she was later interviewed by Detective Quenell at the scene. In the 911 call after the shooting, Gregorio did not mention appellant's name and either she or Josephson said, " 'Someone was already inside the truck.' " and " 'We have no idea who was in the truck with him.' "

Dwayne Fields, who owned the home on Santa Clara Street and was granted immunity for his testimony at trial, testified that he knew Jack Sovereign through Gregorio, and had known him for a couple of years. Fields had no problem with Sovereign coming to his house and was not jealous of his relationship with Gregorio. Sovereign was at the house on May 31, 2010. In May 2010, Fields was using methamphetamine frequently, and had done so for 20 years. He had also been selling methamphetamine for about a year as of 2010.

Appellant, whom Fields knew as "Stompers," had come by Fields's house a couple of times to try to get methamphetamine. On the evening of May 31, 2010,

6

appellant came to the house with Katrina Inong, whom Fields had known for about one and one-half years. They asked if Fields wanted to go in on buying or selling methamphetamine with them. He told them no. There was no discussion about Fields owing Inong money or about Inong and appellant returning to the house in approximately an hour. Fields met Hunsucker when she came to his house with Inong on two occasions. They probably went into his bedroom while they were there.

Fields liked going to the casinos in the late evening and, on June 1, 2010, he left his house to go to Bear River casino about 1:30 a.m.[6] He went with a woman named Pam who "got paid that day and wanted to take [him]." He was at the casino until about 5:30 a.m. He arrived home at 6:00 a.m. and saw that the street was roped off with police tape. He was questioned by police after he got home. Fields testified that he had a two by four foot safe in the closet in his bedroom. Also, "he was not a racist and did not dislike Native Americans."

Humboldt County Deputy Sheriff Chance Landreneaux testified that, about 3:40 a.m. on June 1, 2010, he responded to a call regarding the shooting on Santa Clara Street. There were firefighters, ambulance personnel, and sheriff's deputies already at the scene. There was also a deceased male subject. Landreneaux found an expended shotgun shell on the ground near the curb and an orange earplug was found nearby. Landreneaux learned that Dwayne Fields owned the house where the homicide took place and, about 5:30 a.m., he stopped Fields's car as Fields drove near the house. When Landreneaux said there had been a shooting, Fields did not respond; he did not seem to be surprised or upset. His response seemed out of place to Landreneaux.[7] Fields said he had been at the casino.

---

[6] On cross-examination, Fields acknowledged that, at the preliminary hearing, he had testified that he left his house at 3:15 a.m., after receiving a phone call.

[7] A detective who later interviewed Fields testified that Fields told him that, before he returned home, he had received a message from Amy Josephson telling him that Sovereign had been killed at the house.

Detective Steve Quenell testified that he spoke with Gregorio at the scene about 6:30 a.m. Although she initially said she did not know the "dude" who approached and shot Sovereign, she later referred to him as "Stompers." Quenell clarified that she had said she did not know who "dude" was; she only knew him as Stompers. During the interview, Gregorio's behavior was consistent with someone who was under the influence of methamphetamine.

Officers retrieved security video footage from the Bear River Casino showing that Fields arrived at the casino at 3:22 a.m. and departed at 4:51 a.m. on June 1, 2010.

Doctor Mark A. Super, a forensic pathologist, performed the autopsy on Sovereign. Sovereign died from a close range shotgun wound to the head, which destroyed the left side of his face and skull. The gun could have been fired from inches to a couple of feet away. Sovereign also had several minor contusions and abrasions on his face and leg. A toxicology report showed that he had a significant level of methamphetamine and a therapeutic level of decongestant in his system.

Katrina Inong testified under a grant of immunity. She had pleaded guilty to voluntary manslaughter in connection with Sovereign's death, but had not yet been sentenced.

Inong, who lived in Hoopa, had known appellant for a few years before May 31, 2010. She knew of him as "Stompers." Sonia Hunsucker, who had just gotten out of prison and was on parole, was Inong's cousin; Inong had known Hunsucker for most of her life. During the four-day period before May 31, 2010, she and Hunsucker "hung out" together and "did a little bit of methamphetamine." Inong had first used methamphetamine in 2002, and had used it off and on since then.

Two days before May 31, 2010, Inong, Hunsucker, and another person went to Dwayne Fields's house because Fields owed Inong some money. She also thought he could help her with some work that needed to be done on her father's 4Runner truck. Inong went into the house and talked to Fields, who told her that he had already paid the money he owed her to her friend. He did say he might be able to help her find some car

8

parts. Inong then introduced Fields to Hunsucker, but they left because he did not want Hunsucker there.

On the morning of May 31, 2010, Inong got a phone call from a friend named Candice McKnight, who lived with her fiancé, Tim Richards. After speaking with McKnight, Inong called Hunsucker because she wanted to retrieve a stolen car to get reward money, and she needed Hunsucker's help with contacting Willow Mace, the person she believed had the car.

After picking up her father's 4Runner, Inong and Hunsucker drove to Mace's house in Blue Lake, but did not get out of the car. They then drove to Candice McKnight's house, where they told Tim Richards that they wanted to speak to the owner of the stolen car, a Dodge Neon, to make sure that Inong would receive a $300 reward and Willow Mace would not get into trouble. While waiting for the owner to arrive, Inong and Hunsucker went to pick up Nathan Nix, whom Inong called "Bones." They then returned to McKnight's house, where Hunsucker obtained some methamphetamine, which she and Inong used. Inong, Hunsucker, and Nix then drove to Chuck Gay's apartment to attempt to get drugs for Nix, but they were unsuccessful. They then went back to Willow Mace's house but, when they learned that Mace was not at home, they left. They returned to McKnight's house, where they talked and smoked methamphetamine.

Inong and Hunsucker then stopped for gas before going to pick up Nix again. After another unsuccessful trip to look for the stolen car at Mace's house, they went to Eureka and picked up appellant because Nix needed to talk to him. After picking up appellant, they stopped at a house and appellant went inside. It was nighttime by then. Five minutes later, appellant returned with a shotgun and Inong told him to get it out of her vehicle. Appellant stayed in the car and Inong "started freaking out on him," telling him to get out because she had two parolees in her vehicle and the gun was illegal. After someone suggested they drop the shotgun off at Shane Farnum's house, Inong drove them there. The four of them went into the house, where Inong smoked some

9

methamphetamine and Hunsucker injected methamphetamine.[8] When they left the house, appellant still had the shotgun with him. She was not okay with that, but he would not get out of the car and she did not feel she could make him do so.

Inong, Hunsucker, Nix, and appellant then drove to Fields's house because Inong wanted to see if he had gotten parts for her 4Runner. Inong and appellant went inside and she talked to his roommate, Kelly Gregorio, and met Gregorio's sister and another man, but Fields was not at home. As they left, Fields pulled into the driveway and parked. Inong and appellant went into Fields's bedroom and talked to him about the car parts. She also discussed a possible drug deal with him and introduced him to appellant.

Inong and appellant then left the house, and the foursome drove back to Willow Mace's house, but she still was not there. They therefore returned to Eureka, but Hunsucker got a call that Mace was back in Blue Lake, so they drove there again. Appellant still had the shotgun next to him in the front passenger seat. When they got to Mace's house, Mace handed Hunsucker something and then Inong, Hunsucker, Nix, and appellant went back to Chuck Gay's apartment because Hunsucker felt he had disrespected her and she wanted to confront him.

When they got to Gay's apartment, the four of them got out; Nix was carrying the shotgun. They knocked on the door and Inong saw a baby through the window. Hunsucker and Nix started kicking the door. Inong and appellant ran to her vehicle, and then Nix and Hunsucker came back. Inong told them she "was not cool with the situation" and needed to go home. Appellant said he could store his shotgun at a friend's house. They drove to another nearby house where appellant got out and knocked at the door. He then got back into the front passenger seat of the vehicle, still holding the shotgun, and Hunsucker told Inong to drive to Fields's house.

---

[8] Hunsucker indicated in her testimony that, during the stop at Farnum's house, she injected methamphetamine while the other three—Inong, Nix, and appellant—smoked methamphetamine.

Inong drove to Fields's house and parked in an alley behind the house. Her understanding was that they were going there to rob Fields. After she parked, appellant and Nix injected some methamphetamine. Inong then got into an argument with the other three, telling them it was not cool for them to rob her friend. She drove out of the alley and asked if she could just drop them off. Hunsucker and Nix got hostile and Hunsucker instructed her to park the vehicle. Inong did not believe she had a choice, so she drove the car a block past Fields's street and parked, while arguing with Hunsucker and appellant. She told them it was not necessary for them to rob Fields and that if they needed money, Fields would lend it to them.

Appellant put a bandana over his face and Nix, Hunsucker, and Inong put torn up pieces of a black shirt over their faces. They then walked across the street toward Fields's house. Appellant was holding the shotgun, and he, Hunsucker, and Nix crouched together near the driveway and talked. Inong noticed that Fields's car was not in the driveway and she started to walk back to her car. As she left, she heard "a bunch of gravel" and a horn honking; she then heard a shotgun blast. She had run to her vehicle and opened the door when she saw Hunsucker run up. Appellant and Nix then ran up and jumped into the car. Appellant was holding the shotgun. Inong told them to get out of her car and asked what they had done. Hunsucker, appellant, and Nix "were hugging each other [and] giving each other high fives," and were not listening to Inong. They sat in the car for about 10 minutes, while Inong cried and told them to get out. The other three tried to calm her down and told her to drive away, which she eventually did. As she drove, Hunsucker and Nix told appellant to clean off the gun and "throw it." Inong saw appellant, who was sitting next to her, wiping down the shotgun with rags.

On cross-examination, Inong acknowledged that she had previously testified that Hunsucker had forced her to drive around at knife point on May 31 and June 1, 2010, and that Nix had pointed a shotgun at her and ordered her to drive where Hunsucker wanted her to go. She testified that both of these statements were true, and that Hunsucker had possession of her phone that night.

11

Inong had never seen a safe in Fields's bedroom. When she visited Fields on May 31, 2010, they did not talk about the money he owed her. Instead, they talked about car parts and she asked for methamphetamine. When Inong and Hunsucker visited Fields three days earlier, he told Hunsucker "to take it out of his house." He later told Inong that he said that to Hunsucker because "he had seen something at his friend's house that he didn't like." Inong never got into Sovereign's truck when it was parked in the driveway. Nor did she see anyone else get into the truck. Appellant threw his shoes out of the window of her truck after the shooting.

Although Sonia Hunsucker had been granted immunity, she refused to testify at trial and was held in contempt. Her December 8, 2010 testimony from the preliminary hearing, for which she had also been granted immunity, was read to the jury.

Hunsucker's testimony about most of the events of May 31, 2010, was similar to Inong's testimony. Hunsucker further testified that she knew appellant as "Stompers," and that, when she, Inong, and Nix picked him up on May 31, it was only the second time she had met him. Appellant and Nix knew each other. They then drove to Fields's house because Fields owed Inong money and they hoped to collect it. Inong and appellant went into the house while Hunsucker and Nix waited outside. Inong and appellant returned to the car 10 or 15 minutes later. There was a plan to return to Fields's house to get the money and they discussed getting a gun. Inong said there was no need for a gun and that Fields "wasn't like that." Nix said he did not want any violence and appellant agreed; none of them wanted to go to prison. Nonetheless, appellant went into someone's house and returned with a gun, which he kept with him in the front passenger seat.

Later that night, Inong, Hunsucker, Nix, and appellant drove to Fields's house. They pulled into the back of Fields's yard, where they "got high." They then drove around and parked about a block away. Hunsucker believed that Fields had a safe. Inong "was going to get what was owed to her," and Hunsucker "was going to take his safe." They all put on masks from torn up shirts and walked to a hedge near the driveway of

12

Fields's house.[9]  Appellant had the shotgun.  They saw a vehicle with its lights on in the driveway that they knew was not Fields's.  Initially, they waited at the hedge for the person who owned the vehicle to drive away, so they could rob Fields.  However, when a man came out of the house, got into the vehicle, and did not leave right away, they decided to go back to Inong's truck.[10]  At that point, "[e]verybody said, no, it is not him and wanted to call it off and wanted to go back. . . .  We all headed back, and then [appellant] said, 'fuck that,' and went back over there."

According to Hunsucker, Inong initially tried to get appellant to come back to her vehicle, but she eventually went back toward the truck with Hunsucker and Nix. Hunsucker heard a gunshot and everyone ran to Inong's vehicle and got inside. Appellant was holding the shotgun.  Inong started asking appellant "why he did it and what was wrong with him, and she was just flipping out and upset that he shot that guy, and why did he do it."  Appellant responded that "[i]t was him or the other guy because he said the other guy was reaching for something."  Appellant and Nix touched the backs of their hands together.  They also discussed the need to get rid of the shotgun.  Appellant wiped down the shotgun and threw it out the window of the vehicle.  They also threw their masks out the window.  They decided they needed to get rid of the truck because it had been involved in a murder.  Appellant and Nix drove away in it, and Nix told Hunsucker the next day that they had tried to burn it, but it did not work out very well.

On cross-examination, Hunsucker testified that she was on parole in June 2010. She had suffered several felony convictions and had served three terms, for a total of seven years, in state prison.  She and Nix had been in a romantic relationship for about two months, since Nix got out of prison.  Hunsucker also acknowledged that during the week before June 1, 2010, she and Inong were hanging out and using methamphetamine daily.  Three days before June 1, Hunsucker, Inong, and a male friend went to Fields's

_____

[9] Hunsucker later clarified that appellant was wearing a bandana over his face and the other three were wearing masks from the torn up shirts.

[10] Hunsucker testified that she had never met Jack Sovereign.

house.  Inong initially went inside alone to talk to Fields about the money he owed her.  Inong then brought Hunsucker inside, where there were women present, as well as Fields.  Hunsucker had seen Fields before, but met him for the first time that day.  She and Inong talked to Fields in his room, and Hunsucker asked if Fields wanted to buy some drugs with them.  Fields said he was going to get some drugs on his own.[11]  Hunsucker was probably under the influence of methamphetamine during this visit since she was injecting methamphetamine on a daily basis at that time.  She agreed that it was possible that the effects of methamphetamine could have altered her perception of reality on that day.

After Inong and appellant came out of Fields's house on the evening of May 31, 2010, they said that Fields would have at least $200 for Inong in an hour or two.  After that, Hunsucker got $50 worth of crystal methamphetamine from a friend while Inong, Nix, and appellant waited in the truck.  Later that night, they went to another person's house, where Hunsucker injected methamphetamine.  Everyone else was getting high also.  They then went to Fields's house, where she gave the $50 worth of methamphetamine to appellant and Nix, both of whom injected it.  She wanted them to get high because they were falling asleep.

Although Inong planned to collect her money from Fields, "peer pressure" caused her to go with the others to take the safe.  When they saw a man other than Fields in the driveway, they wanted to call off the plan because "[e]veryone knew it was going too

Hunsucker also acknowledged that she and Inong smoked $40 worth of methamphetamine on May 31, 2010, about 5:00 or 5:30 p.m.  Hunsucker did not recall if she smoked any more methamphetamine after picking up appellant on May 31.  She did not think she was high all day.  Regarding the safe in Fields's bedroom, she had first seen it three days before June 1, when she and Inong went to Fields's house.  The safe was about four feet tall and two feet wide, and it had a dial on the front of it.

---

[11] Hunsucker knew Fields had "stopped by a few houses and dropped off a bag or two," but she had never bought drugs from him herself.

far." They all initially pulled back, but then appellant said, "Fuck it" and went back toward the man, even though Inong tried to stop him, saying, "No" and "Don't." The other three were returning to the 4Runner when Hunsucker heard a gunshot.

Hunsucker had injected methamphetamine once and smoked it twice that day. She was probably high, but she did not feel it. She had not slept for about two weeks and had been taking speed every day for the previous 90 days, ever since she got out of prison. She agreed that the drugs and lack of sleep had an effect on her ability to perceive the things going on around her on May 31 and June 1, 2010.

Willow Mace testified that, late on the night of May 31, 2010, Inong drove up to Mace's boyfriend's house in Blue Lake. She was driving a Toyota 4Runner. Hunsucker and appellant were also in the car, and there was a fourth person in the backseat, but Mace could not see who it was. Appellant, whom Mace had known for years, was sitting in the front passenger seat with what appeared to be a gun lying on his leg, going down to the floorboard. Hunsucker asked Mace about a stolen car, which Hunsucker wanted back so she could get money for it. But Mace did not have the car, and she gave Hunsucker $40 worth of methamphetamine to get her to leave.

Kim Sovereign testified that, on June 1, 2010, she was at Chuck Gay's apartment with a two-year-old child. About 3:00 a.m., she heard people beating on the door. The door was kicked in, at which point she called law enforcement.

Deputy Bryan Waxler testified that he responded to the call from Kim Sovereign at 3:10 a.m. and saw a door that appeared to have been kicked in. He was called from that scene directly to Fields's home on Santa Clara Street, where Jack Sovereign had just been shot. The drive took about four minutes; he arrived at Fields's house at 3:34 a.m.

Timothy Richards, who was Jack Sovereign's brother, testified that he knew Inong and Hunsucker. He had met Nix the day before Sovereign was killed when Nix, Inong, and Hunsucker stopped by his house in a Toyota 4Runner, which Inong was driving. Richards and Inong had talked about getting a stolen car back and splitting the reward. Inong needed gas in her car so that she could retrieve the stolen car. Richards therefore met the other three at a Renner gas station and paid for Inong to get gas. At trial, he

15

described a surveillance photograph the prosecutor showed him, which depicted him putting gas in his truck while Inong and Hunsucker stood across from him. He did not see Hunsucker, Inong, or Nix again that night.

Detective Quenell interviewed Inong at her residence in Hoopa on June 3, 2010. On June 4, officers found a gray Toyota 4Runner on a dirt road in the Hoopa area. The area around the gas cap and a right rear tire were charred.

On June 15, 2010, Deputy Conan Moore went to a residence in Weitchpec in search of Hunsucker. A red Dodge Neon, which Hunsucker had reportedly been driving, was parked outside. Moore found Hunsucker hiding in a bathroom and placed her under arrest. He ascertained that the Dodge Neon had been stolen and found a red bandana inside the center console of the vehicle.

Detective Quenell interviewed Hunsucker at the Humboldt County Sheriff's Office on June 15, 2010. Hunsucker accompanied Quenell and other deputies as they searched the area of Myrtle Avenue for the shotgun and masks, but they were unable to find anything. On June 14 and 23, two unfired shotgun shells were recovered on the side of the road in the Myrtle Avenue area; they were the same gauge and brand as the expended shell found at the scene of the shooting on June 1. On June 16 and 17, four pieces of a black T-shirt were found near Myrtle Avenue. On June 30, a shotgun was located in the same area. It was determined that the expended shotgun shell found at the scene was fired from the shotgun. No fingerprints or DNA was found on the shotgun.

***Defense Case***

Sonia Hunsucker's testimony from Nix's preliminary hearing was read to the jury. She had testified—similarly to her testimony at appellant's preliminary hearing—that appellant had the shotgun and went back and shot Sovereign after the others decided to return to Inong's truck. Hunsucker had gone to Field's house because she wanted to rob a safe, which she had seen hidden in the corner of Fields's bedroom. The other three, however, went because they wanted to get the money that was owed to Inong, which they had been discussing all day. Hunsucker denied that she had threatened Inong with a knife or that Nix had pointed a gun at Inong. She did not see Nix with a shotgun that night.

16

Amy Josephson, Gregorio's sister, testified that she had been living at Fields's house for about 10 days, as of June 1, 2010. In the early morning of June 1, Josephson, Gregorio, Sovereign, and John "Skip" Kable were at the house. She noticed that Fields and Sovereign were "moody" with each other. About 20 minutes before Sovereign was shot, Fields received a phone call, jumped out of bed and into his clothes, and ran out of the house. This was unusual because Fields did not take phone calls or leave the house that late. Shortly after Fields left, Kable was in a hurry to leave and tried to get Josephson to go with him, but he ultimately left without her. Before Sovereign left, Josephson saw Gregorio put methamphetamine into a syringe for him, which he injected. When Sovereign left the house, he was groggy and sleepy, which he should not have been just after injecting methamphetamine.

Gregorio left the house with Sovereign, but then ran back inside and told Josephson that Sovereign had been shot. Gregorio asked Josephson to call 911, which she did. Gregorio grabbed the phone from her and then ran back outside. When Josephson picked up the phone again, the call with 911 had been disconnected. Her testimony implied that Gregorio had intentionally disconnected the call. Josephson therefore dialed 911 again. After the shooting, Gregorio told Josephson that "she had taken a bag out from under Jack's balls" so he would not be caught with it. The next morning, Josephson saw a glass in the house that Sovereign had used, and it had a red ring around it. A month or two earlier, Josephson had given red sleeping pills to Gregorio. Josephson never saw a safe in Fields's house.

John Kable, whose nickname was "Skip," testified that he was at Fields's house on June 1, 2010, with the hope of "maybe getting hooked up with Amy [Josephson] and bringing her home." Fields left the house at approximately 3:00 a.m., and Kable left not more than 10 minutes later. Kable did not see anyone outside of the house when he left. About an hour before he left, Kable saw Gregorio make Sovereign a drink. While Kable was at the house, Sovereign had approached him and offered to sell him some methamphetamine. He also heard Sovereign "discussing prices and quantities" on the phone. Kable did not see any unpleasant exchange between Sovereign and Fields, but

17

had seen a scowl on Fields's face. Kable did not recall ever seeing a safe in Fields's bedroom.

Deputy Seth Crosswhite testified that he arrived at the house on Santa Clara Street shortly after Sovereign was shot and observed Gregorio "cradling [Sovereign] with a towel held to his head." She and Josephson "were frantically screaming." Gregorio made several spontaneous statements, including that " '[t]hey shot him. They must have been hiding in the truck.' " She later said that Sovereign was in the truck looking for something and, as she went back to the house, she heard a commotion and the shot. When she came back out, she saw someone running away. She also said that she thought the shooting had to do with a stolen motorcycle that Sovereign was in the process of stripping down. Finally, she said "that she believed it was somebody she referred to as Stompers, and a person she referred to as Trinie . . . saying that she had been there a few times. And she saw the guy running off, and she could see a bandana over the subject's face, but she recognized the eyes and other objects on the subject that she recognized him as being Stompers."

Dr. Jane Williams testified that dextromethorphan is a cough suppressant that is sometimes used recreationally. If a sufficient quantity is taken, it can cause sleepiness. This effect would be increased by also drinking alcohol. If used with methamphetamine, it would increase heart rate and blood pressure. Dextromethorphan is sold as a cough syrup or pills. The pills are usually red in color. Dr. Williams was unable to determine the dosage Sovereign had taken from his toxicology report because there was no indication of when he had taken the medication.

A criminalist testified that several items, including an earplug, swabs from a shotgun, and swabs from pieces of fabric, tested negative for DNA, contained insufficient DNA, or had DNA that did not match the DNA of Sovereign, Inong, Hunsucker, Nix, or appellant. A shotgun that had been wiped down, left out in the rain, or left outdoors for at least two weeks would likely not have DNA on it.

After the defense rested, the parties stipulated to several matters, which the trial court read to the jury: that Inong had pleaded guilty to voluntary manslaughter in this

18

case; that Hunsucker had previously been convicted of carjacking, presenting false identification to a peace officer, evading a peace officer, and—in a subsequent, unrelated case—murder; that, at the time of Hunsucker's arrest in this matter, she was in possession of a red Dodge Neon that had been reported stolen on June 9, 2010, and that methamphetamine is a central nervous system stimulant drug and a controlled substance that can significantly change the brain functions of chronic users, as well as cause other negative emotional, cognitive, psychological, and health effects.

## DISCUSSION

### I. *The Trial Court's Failure to Instruct on Second Degree Murder*

The contention we first address is whether the trial court erred when it failed to instruct sua sponte on the lesser-included offense of second degree murder or, in the alternative, whether counsel was ineffective for requesting that the court not instruct the jury on second degree murder.

### A. *Trial Court Background*

The trial court, the prosecutor, and defense counsel discussed jury instructions off the record. During a subsequent discussion, the court listed the instructions it would be giving, and stated that it was looking at CALCRIM No. 640, regarding deliberations and completion of verdict forms, which must be given sua sponte "[i]n all homicide cases in which the defendant is charged with first degree murder and one or more lesser offense is submitted to the jury." (CALCRIM No. 640, Bench Notes, 2009 rev.) The court said it was "striking 'second degree murder,' since we're agreeing that is not requested. So it reads, you will be given verdict forms for guilty, not guilty for first degree murder and voluntary manslaughter." The court then reiterated, that it was taking the phrase, "second degree murder" out of CALCRIM No. 640, explaining, "We're not instructing them on that, as requested by defense counsel."

When the court instructed the jury, it gave CALCRIM No. 520, which defines murder and both express and implied malice. The last sentence of that instruction reads, "If you decide that the defendant committed murder, you must then decide whether it is murder of the first or second degree." In the written instruction, the court crossed out the

19

last three words of that sentence.  When it read the instruction to the jury, however, the court included those three words, but then stated, "I should strike that.  Second degree is not before the jury so—or second degree is stricken."

The court instructed on, inter alia, first degree malice murder (CALCRIM Nos. 520, 521), first degree felony murder (CALCRIM No. 540A), and voluntary manslaughter based on sudden quarrel or heat of passion (CALCRIM No. 570).

## B.  *Legal Analysis*

### 1.  *The Trial Court's Duty to Instruct*

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.]  That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citations], but not when there is no evidence that the offense was less than charged.  [Citations.]' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)  In *Breverman*, the California Supreme Court explained that " '[a] trial court's failure to inform the jury of its option to find the defendant guilty of [a] lesser [included] *offense* [supported by the evidence] would impair the jury's truth-ascertainment function' by forcing the jury 'to make an "all or nothing" choice between conviction of the crime charged or complete acquittal, thereby denying the jury the opportunity to decide whether the defendant is guilty of a lesser included offense established by the evidence.' [Citation.]" (*Breverman*, at p. 158, quoting *People v. Barton* (1995) 12 Cal.4th 186, 196.)

"[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury.  [Citations.]  'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" '

that the lesser offense, but not the greater, was committed. [Citations.]" (*Breverman*, *supra*, 19 Cal.4th at p. 162.) This "sua sponte duty to instruct on lesser included offenses, unlike the duty to instruct on mere defenses, arises even against the defendant's wishes, and regardless of the trial theories or tactics the defendant has actually pursued. Hence, substantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself." (*Breverman*, at pp. 162-163.)

We independently review a claim that the trial court erred in failing to instruct on a lesser included offense. (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

Second degree murder is a lesser included offense of first degree malice murder, which was charged in this case. (See § 187, subd. (a); *People v. Taylor* (2010) 48 Cal.4th 574, 623 (*Taylor*); *People v. Anderson* (2006) 141 Cal.App.4th 430, 445.) " 'Second degree murder is the unlawful killing of a human being with malice, but without the additional elements . . . that would support a conviction of first degree murder. [Citations.]' [Citation.] Malice may be express or implied. [Citation.] Malice will be implied 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life. [Citations.]' [Citations.]" (*Taylor*, at pp. 623-624.)

The recent case of *People v. Banks* (2014) 59 Cal.4th 1113 (*Banks*), overruled on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, footnote 3, which has factual similarities to the present case, is instructive on the question of the sufficiency of the evidence to support a second degree murder instruction. In that case, evidence established that a gunman approached the victim at an ATM machine and the two "engaged in some sort of discussion (perhaps an argument), and [the victim] turned toward the ATM before being shot." (*Banks*, at p. 1161.) Our Supreme Court found that this evidence was sufficient for the jury to infer that the gunman—identified as the defendant—was attempting to commit a robbery. A witness, however, had testified that the victim "and the gunman were arguing, and there was no evidence that defendant took

21

any property or money from [the victim] after the shooting." (*Ibid*.) The court concluded that the evidence thus permitted the inference that the defendant shot the victim "with malice in the course of an argument or fight, not necessarily in the course of a robbery," and that because "the evidence was sufficient to support a theory of second degree murder, the court should have instructed the jury on that theory." (*Ibid*.)

In this case, the evidence supporting a second degree murder theory was stronger than in *Banks*. There was significant evidence showing that, after the group that included appellant saw Sovereign walking to his truck, they abandoned the plan to rob Fields and were turning to leave when appellant, who had injected methamphetamine just minutes earlier, inexplicably said, "Fuck that," and ran to Sovereign's truck holding a shotgun. Gregorio testified that she then saw appellant and Sovereign "wrestling, struggling," and heard Sovereign say, "What the fuck" and "God damn" just before she heard a gunshot. Inong testified that she "heard a bunch of gravel," then a honking horn, and then a shotgun blast. Hunsucker testified that, when Inong asked appellant "why he did it and what was wrong with him," appellant said it was "him or the other guy because he said the other guy was reaching for something." As in *Banks*, along with this evidence of a struggle and possible argument, there was no evidence that appellant took or attempted to take anything from Sovereign during or after their encounter. We conclude the evidence was sufficient to support a theory of second degree murder. (See *Taylor*, *supra*, 48 Cal.4th at pp. 623-624; see also *People v. McNally* (2015) 236 Cal.App.4th 1419, 1425 ["[i]t is settled that brandishing a loaded firearm at a person is an act dangerous to human life," and, " '[e]ven if the act results in a death that is accidental, . . . the circumstances surrounding the act may evince implied malice' "].) The trial court was therefore obligated to give a second degree murder instruction. (See *Banks*, *supra*, 59 Cal.4th at pp. 1160-1161; *Breverman*, *supra*, 19 Cal.4th at pp. 162-163.)

## 2. *Invited Error*

Respondent argues that even if the court was required to instruct on second degree murder, defense counsel invited the court's error by requesting that the court *not* give a second degree murder instruction. We agree.

22

" 'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal. . . . [I]t also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.' In cases involving an action affirmatively taken by defense counsel, we have found a clearly implied tactical purpose to be sufficient to invoke the invited error rule. [Citations.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49 (*Coffman*).)

In *Coffman*, *supra*, 34 Cal.4th at page 49, the California Supreme Court found invited error where defense "counsel did not merely acquiesce, but affirmatively joined in [codefendant's] challenge to Prospective Juror B., and thus cannot be heard to claim the court erred in excusing her." (Accord, *People v. Seaton* (2001) 26 Cal.4th 598, 668 [finding that "defendant invited any conceivable error in giving these instructions because he asked the trial court to give them"].) In *People v. Moon* (2005) 37 Cal.4th 1, 28, on the other hand, where counsel merely failed to oppose the giving of an instruction, our Supreme Court found no invited error since the "invited error doctrine will not preclude appellate review if the record fails to show counsel had a tactical reason for requesting or acquiescing in the instruction." The court distinguished *Coffman*, in which "counsel's affirmative action, as opposed to mere acquiescence, implied a tactical purpose." (*Moon*, at p. 28; accord, *People v. Moore* (2011) 51 Cal.4th 386, 410 ["Trial counsel's failure to detect in the standard instructions the flaw appellate counsel perceives and [the failure] to request a modification does not demonstrate a tactical intent to induce the error now claimed"].)

Here, the record reflects that defense counsel expressly requested that the trial court not instruct the jury on second degree murder. While the discussion regarding jury instructions was not held on the record, the trial court's remarks made clear that it would not be giving a second degree murder instruction at counsel's request. Moreover, although counsel's reason for this request was not stated on the record, that he affirmatively made the request demonstrates a "clearly implied tactical purpose," which

23

is "sufficient to invoke the invited error rule." (*Coffman*, *supra*, 34 Cal.4th at p. 49.) Consequently, appellant cannot now claim the court erred in failing to instruct the jury on second degree murder. (See *ibid*.)

### 3. *Ineffective Assistance of Counsel*

Appellant nonetheless contends that, to the extent his claim of error is precluded because defense counsel invited the trial court's error in failing to instruct on second degree murder, counsel was ineffective for making such a request.

To prove ineffective assistance of counsel, a defendant must show that "counsel's representation fell below an objective standard of reasonableness . . . [¶] . . . under prevailing professional norms." (*Strickland v. Washington* (1984) 466 U.S. 668, 688 (*Strickland*).) In addition, the defendant must affirmatively establish prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id*. at p. 694.)

### a. *Adequacy of Counsel's Representation*

"Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Citation.] Defendant's burden is difficult to carry on direct appeal, as we have observed: ' "Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission." ' [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437 (*Lucas*).)

In the present case, as already discussed (see part I.B.1, *ante*), substantial evidence was presented at trial that the killing of Sovereign constituted second degree murder. Nonetheless, if the record reflects that defense counsel made a rational tactical decision to request that the trial court not give an instruction on second degree murder, ineffective assistance of counsel has not been shown. (*Lucas*, *supra*, 12 Cal.4th at pp. 436-437.) We are, however, unable to discern any rational tactical purpose for counsel's request. The

24

only conceivable reason counsel could have had for not wanting the court to give a second degree murder instruction was that the defense theory was that appellant was not even involved in the shooting and counsel was looking for an " 'all or nothing' " verdict. (*Breverman*, *supra*, 19 Cal.4th at p. 158.) Assuming that was counsel's reason[12]—and putting aside any questions about the strength of counsel's chosen defense—we find that counsel's request was *not* a rational tactical decision, particularly given that there is no sign that he objected to the court's instruction on voluntary manslaughter, based on sudden quarrel or heat of passion.

"A heat of passion theory of manslaughter has both an objective and a subjective component. [Citations.] [¶] ' "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' " [Citation.]' [Citation.] '[T]he factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]' [Citation.]" (*People v. Moye* (2009) 47 Cal.4th 537, 549-550.)

Here, the evidence of provocation by Sovereign was weak, at best, and certainly did not demonstrate conduct " 'sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.' " (*People v. Moye*, *supra*, 47 Cal.4th at p. 550.) That counsel would not object to the voluntary manslaughter instruction, for which there was so little supporting evidence, but

---

[12] Because we are able to decide this issue based on the trial record alone, we need not look to the supplemental documents appellant has submitted in support of his petition for writ of habeas corpus.

25

would object to a second degree murder instruction for which substantial evidence existed, was particularly unreasonable. The jury was thereby left with only two real options: a first degree murder conviction or an acquittal, in a case in which the evidence of appellant's presence and participation in the shooting was extremely strong. We conclude that it was wholly unreasonable for counsel to ask the court to keep the second degree murder option from the jury in the circumstances of this case, and counsel's representation was therefore inadequate. (See *Strickland*, *supra*, 466 U.S. at p. 688; *Lucas*, *supra*, 12 Cal.4th at pp. 436-437.)

### b. *Prejudice*

"In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. [Citations.] Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different. [Citation.] This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland's* prejudice standard and a more-probable-than not standard is slight and matters 'only in the rarest case.' [Citation.] The likelihood of a different result must be substantial, not just conceivable." (*Harrington v. Richter* (2011) 562 U.S. 86, 111 (*Harrington*).)

Here, we conclude it is reasonably likely the result would have been different had the trial court instructed the jury on second degree murder. (See *Harrington*, *supra*, 562 U.S. at p. 111; *Strickland*, *supra*, 466 U.S. at p. 694.) As discussed in part I.B.1, *ante*, there was strong evidence that appellant committed second degree implied malice murder when he ran up to Sovereign with the shotgun soon after injecting methamphetamine and after the group had expressly abandoned the robbery plan. Following a short struggle, Sovereign was shot in the face and appellant told the others afterwards that it was "him or the other guy," and that he had seen the victim reaching for something. In addition, a stipulation was read to the jury about the effects of methamphetamine use, including, inter alia, that it is a central nervous system stimulant; that taking even small amounts of methamphetamine can result in physical effects that include increased physical activity

26

and rapid heart rate; that long-term methamphetamine abuse can cause "anxiety, confusion, insomnia mood disturbances and violent behavior. Chronic methamphetamine abusers can display a number of psychotic features including paranoia, visual and auditory hallucinations and delusions." All of this evidence suggested that appellant's unusual conduct could have been a result of his voluntary intoxication.[13]

Moreover, as noted, although the court instructed on heat of passion voluntary manslaughter, there was very little evidence to support that option. The evidence appellant murdered Sovereign willfully, deliberately or with premeditation was circumstantial and weak at best. Importantly, the jury found not true the allegation that appellant intentionally discharged the gun when he shot Sovereign, apparently rejecting express malice. While the jury could have found that the evidence supported a finding that appellant's intent was to rob Sovereign, a different conclusion was at least as plausible: that appellant, who had just injected methamphetamine, was behaving irrationally and with conscious disregard for the danger to others when he suddenly approached Sovereign with a loaded shotgun after the plan to rob Fields was abandoned. (Compare *Banks*, *supra*, 59 Cal.4th at p. 1161 [trial court's error in failing to instruct on second degree murder was harmless where it was not reasonably probable that properly instructed jury would have concluded that defendant shot victim at ATM during an argument where "far more plausible inference" was that he shot victim during robbery].)

The prejudicial effect of counsel's request that a second degree murder instruction not be given was compounded by the court's incorrect instruction on the felony-murder

---

[13] As we shall discuss in part II., *post*, we need not resolve appellant's additional contention that counsel was ineffective for failing to request an instruction on voluntary intoxication and for failing to argue that theory to the jury. We do again observe, however, that there was significant evidence suggesting that the shooting of Sovereign was related to appellant's injection of methamphetamine shortly beforehand. We also observe that the defense theory that appellant was not involved in the shooting of Sovereign and that there was a conspiracy between several other trial witnesses to kill Sovereign was rather far-fetched, in light of testimony by a number of different witnesses buttressing the prosecution theory that appellant was both present at Fields's house and was the shooter.

special-circumstance allegation, pursuant to CALCRIM No. 730. The court gave a version of CALCRIM No. 730 that is applicable to aider and abettor liability, which, as respondent acknowledges "allowed the jury to find the special circumstance true if it found appellant conspired to commit the underlying felonies; it did not require a finding that he committed the murder while engaged in the commission of or attempt to commit the underlying felonies."[14] This instruction was particularly problematic in the circumstances of this case in which there was substantial evidence both that there was a conspiracy to rob Fields *and* that the plan was abandoned before appellant approached Sovereign's truck. The language of this instruction—with its emphasis on the earlier

---

[14] The court's instruction pursuant to CALCRIM No. 730 read as follows: "The defendant is charged with the special circumstance of murder committed while engaged in the commission of Robbery or Burglary in violation of Penal Code section 190.2[, subdivision] (a)(17).

"To prove that this special circumstance is true, the People must prove that:

"1. The defendant was a member of a conspiracy to commit Robbery or Burglary;

"2. The defendant intended that one or more members of the conspiracy commit Robbery or Burglary;

"3. The defendant did an act that caused the death of another person; [¶] AND

"4. The act causing the death and the Robbery or Burglary or attempted Robbery or Burglary were part of one continuous transaction.

"To decide whether the perpetrator committed or attempted to commit Robbery or Burglary, please refer to the separate instructions that I will give you on those crimes. To decide whether the defendant was a member of a conspiracy to commit a crime, please refer to the separate instructions that I will give you on conspiracy. You must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony murder.

"The defendant must have been a member of a conspiracy to commit the felonies of Robbery or Burglary before or at the time of the act causing death."

The Bench Notes for CALCRIM No. 730 explain which version of the instruction should be given depending on whether the prosecution's theory is that the defendant is the direct perpetrator, an aider and abettor, or a coconspirator. Here, the court did not give the form of instruction based on the prosecution's theory that appellant was the direct perpetrator.

conspiracy—also could have confused the jury about the elements of first degree felony murder generally.[15]

The court's instruction on malice murder under section 187—CALCRIM No. 520—only added to the jury's likely confusion. That instruction defined express and implied malice, explaining to the jury that "[t]here are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder." After explaining that appellant acted with express malice "if he unlawfully intended to kill," the court further instructed: "The defendant acted with *implied malice* if: [¶] He intentionally committed an act; [¶] [t]he natural and probable consequences of the act were dangerous to human life; [and] [h]e deliberately acted with conscious disregard for human life. [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular

---

[15] Respondent agrees with appellant that this instructional error was prejudicial, requiring reversal of the special circumstance finding. We need not definitively decide whether this error was independently prejudicial, given our conclusion that we must in any case reverse the first degree murder conviction and the felony-murder special-circumstance finding for the reasons discussed in the text. In light of our reversal on other grounds, we also need not address appellant's additional argument that CALCRIM No. 730 is unconstitutional because it impermissibly expands the felony-murder special-circumstance to include being a member of a conspiracy, which appellant claims goes beyond the parameters of section 190.2. That section permits a special circumstance allegation to be found true only where "[t]he murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit" certain felonies. (§ 190.2, subd. (a)(17).)

In addition, the jury's true finding on the felony-murder special-circumstance allegation based on this erroneous instruction thus does *not* show that the jury necessarily would have failed to find appellant guilty of second degree murder, had that instruction been given. (See *People v. Campbell* (2015) 233 Cal.App.4th 148, 167, 172 [true finding on felony-murder special-circumstance allegation did not automatically render harmless court's erroneous failure to instruct on lesser included offenses of second degree murder and voluntary manslaughter; consideration of entire record, including factual context and other instructions, was necessary].)

period of time." The court concluded the instruction as follows: "If you decide that the defendant committed murder, you must then decide whether it is murder of the first[.]" As noted, the court crossed out the remainder of the final sentence of CALCRIM No. 520, which stated, "or second degree."[16] This disastrous instruction told the jury that it could find appellant guilty of murder if it determined he acted with implied malice, as described in the instruction, but took away the option of convicting him of second degree murder, the only type of murder to which the implied malice portion of the instruction could apply. (See *People v. Knoller* (2007) 41 Cal.4th 139, 156 ["a conviction for second degree murder, based on a theory of implied malice, requires proof that a defendant acted with conscious disregard of the danger to human life"].)

The prosecutor's closing argument further exacerbated the problem. When discussing what appellant's possible motive could have been when, after everyone "thought it was over" and started heading back to the car, appellant said "Fuck it," ran back to the truck, and killed Sovereign, the prosecutor asked, "So what is his motive? Is it the robbery? Is it something else? [¶] Well, ladies and gentlemen, we don't need to prove motive to you. It could be that there is a motive that you and I will never know, but motive is not an element. The prosecution doesn't need to prove that to you in any murder case.

"The—the absence of motive, you can use. You can say, well, hey, they're best friends. That's his brother. They've known each other forever. The absence of motive, you can use to say he didn't do it, but it also isn't the absence of the fact that he did do it. So if you're saying, okay, they're all going there. I don't understand. I don't understand why he did this. I don't know what his motive was. That is not reasonable doubt . . . ."

Later, after discussing the possible theories by which the jury could find appellant guilty of murder, the prosecutor concluded, "If some of you say, felony murder and some

---

[16] When it read this instruction to the jury, the court concluded: "If you decide the defendant committed murder, you must decide whether it is murder of the first or the second degree. I should strike that. Second degree is not before the jury—or second degree is stricken."

of you say implied malice and actual malice, gets [*sic*] what?  Still murder.  You can use that.  You don't necessarily need to agree on all of the theories for murder."  The prosecutor's argument highlights the lack of clear evidence regarding whether appellant possessed the requisite intent for either first degree malice murder or felony murder.[17]  As with the misleading instructions, the prosecutor's comments suggested to the jury that it could find appellant guilty of first degree murder even if it did not believe that appellant acted with either felonious intent or express malice, but only with implied malice.

In sum, the absence of a second degree murder instruction essentially left the jury with the all or nothing choice of first degree murder or acquittal, when the evidence suggested a middle ground.  The misleading instructions on implied malice murder and the felony-murder special-circumstance, together with the prosecutor's confusing argument, further muddied the situation and made it more likely that the jury would find appellant guilty of first degree felony murder based on a mistaken understanding of the law of felony murder and implied malice murder, and regardless of whether the evidence truly supported such a verdict.  Appellant plainly was prejudiced by counsel's request that the court not instruct the jury on second degree murder.  (See *Harrington*, *supra*, 562 U.S. at p. 111; *Strickland*, *supra*, 466 U.S. at p. 694.)

Because counsel's representation was deficient and there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different, appellant's first degree felony-murder conviction and the accompanying special

---

[17] In its briefing and at oral argument, respondent asserted that felony murder was the only reasonable verdict in this case because the evidence overwhelmingly showed that, after the others called off the robbery of Fields, appellant decided to rob Sovereign, a known drug dealer who likely had drugs and money in his possession.  Respondent argues that the jury must have based its verdict on this evidence.  "The fatal flaw in this . . . theory, however, is that it was simply not the theory on which the case was tried."  (*People v. Green* (1980) 27 Cal.3d 1, 67, overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 235-236 & *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3.)  Rather, as noted in the text, the prosecutor expressed uncertainty about the reason for appellant's conduct, telling the jury during closing argument, "[i]t could be that there is a motive that you and I will never know . . . ."

circumstance true finding must be reversed. (See *Strickland*, *supra*, 466 U.S. at pp. 688, 694.)[18]

## II. *Appellant's Other Contentions*

Appellant has raised several additional issues, including the trial court's failure to instruct on attempt in connection with the predicate felonies, the court's failure to instruct on the nexus or causal connection requirement of felony murder, and the alleged ineffective assistance of counsel related to the failure to pursue a defense of voluntary intoxication.

### A. *Contentions Relating only to the First Degree Murder Conviction or the Special Circumstance True Finding*

We need not resolve the merits of appellant's claim regarding the court's failure to instruct on the nexus or causal connection requirement of felony murder, raised on direct appeal and in his petition for writ of habeas corpus, since this claim relates to the first degree murder conviction and/or special circumstance true finding, which we have already determined must be reversed. (See part I., *ante*.)

We will, however, address appellant's claim that the trial court erred in failing to instruct on attempt in connection with the predicate felonies, while instructing on the

---

[18] "Under section 6086.8, subdivision (a)(2) of the Business and Professions Code we are required to notify the State Bar of a reversal in a judgment if it is the result of 'misconduct, incompetent representation, or willful misrepresentation.' There is authority indicating that criminal law ineffective assistance of counsel comes within this statute. [Citation.] Accordingly, pursuant to Business and Professions Code section 6086.7, subdivision (a)(2), the clerk of this court is ordered to forward a copy of this opinion to the State Bar upon return of the remittitur. Further, pursuant to Business and Professions Code section 6086.7, subdivision (b), the clerk of this court shall notify [appellant's] trial counsel—who need *not* be named in this opinion—that the matter has been referred to the State Bar." (*People v. Pangan* (2013) 213 Cal.App.4th 574, 585, fn. 10, citing *Barner v. Leeds* (2000) 24 Cal.4th 676, 689 ["if incompetent representation results in the modification or reversal of a judgment, counsel must be reported to the State Bar"].)

completed offenses for which there was no evidence. We agree that the court erred and that the error contributed to the flawed result in this case.[19]

The trial court gave CALCRIM No. 540A, the standard CALCRIM instruction defining felony murder, which stated, inter alia: "To prove that the defendant is guilty of first degree murder under this theory, the People must prove that: [¶] 1. The defendant committed or attempted to commit Robbery or Burglary; [¶] 2. The defendant intended to commit Robbery or Burglary; [¶] AND [¶] 3. While committing or attempting to commit Robbery or Burglary, the defendant caused the death of another person. [¶] . . . [¶] To decide whether the defendant committed or attempted to commit Robbery or Burglary, please refer to the separate instruction that I will give you on those crimes. You must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony murder."

The trial court then instructed the jury on the completed crimes of robbery and burglary (CALCRIM Nos. 1600 & 1700), but failed to instruct on attempted robbery and burglary (CALCRIM No. 460), even though the evidence presented at trial—and the prosecutor's theory of the case—supported only the attempt instruction.[20] This was

---

[19] We reject respondent's claim that appellant forfeited this contention by failing to raise it in the trial court. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 503, citing § 1259 ["Instructions regarding the elements of the crime affect the substantial rights of the defendant, thus requiring no objection for appellate review"].)

[20] CALCRIM No. 460 provides in relevant part: "To prove that the defendant is guilty of [attempted robbery or burglary], the People must prove that:

"1. The defendant took a direct but ineffective step toward committing [robbery or burglary];

"AND

"2. The defendant intended to commit [robbery or burglary].

"A *direct step* requires more than merely planning or preparing to commit [robbery or burglary] or obtaining or arranging for something needed to commit [robbery or burglary]. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to commit [robbery or burglary]. It is a direct movement towards the commission of the crime after

33

error. (See *People v. Crary* (1968) 265 Cal.App.2d 534, 539-540 [where trial court instructed only on completed offense of robbery, but evidence supported attempted robbery instruction and trial court did not so-instruct, reversal was required].) The issue is not, as respondent asserts, merely a failure to instruct on attempt as a lesser included offense of robbery, for which no instruction was required. Rather, it was a failure to instruct on one of the elements of the offense of felony murder, i.e., that the killing was committed "in the perpetration of, *or attempt to perpetrate*," a predicate felony, here robbery or burglary. (§ 189, italics added; see CALCRIM No. 540A.)[21] Hence, the trial court had a sua sponte duty to instruct on attempt. (See *Breverman*, *supra*, 19 Cal.4th at p. 154.)

We further conclude that this failure to instruct on attempted robbery, compounded by the lack of evidence and argument supporting the instructions on completed robbery and burglary, was prejudicial under *Chapman v. California* (1967) 386 U.S 18, 27. (See *People v. Flood* (1998) 18 Cal.4th 470, 491 [jury instructions relieving prosecution of burden of proving beyond a reasonable doubt each element of charged offense violate defendant's due process rights]; see also *People v. Singleton* (1987) 196 Cal.App.3d 488, 492 ["Trial courts are duty-bound to avoid instructions

---

preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt.

"[A person who attempts to commit [robbery or burglary] is guilty of attempted [robbery or burglary]even if, after taking a direct step towards committing the crime, he or she abandoned further efforts to complete the crime or if his or her attempt failed or was interrupted by someone or something beyond his or her control. On the other hand, if a person freely and voluntarily abandons his or her plans before taking a direct step toward committing [robbery or burglary], then that person is not guilty of attempted [robbery or burglary].

To decide whether the defendant intended to commit [robbery or burglary], please refer to the separate instructions that I (will give/have given) you on that crime. [¶] [The defendant may be guilty of attempt even if you conclude that [a robbery or burglary] was actually completed.]" (CALCRIM No. 460.)

[21] The special circumstance allegation in the first amended information alleged that the murder was committed "in the commission of the crime of robbery or attempted robbery . . . ."

34

which are not justified by the facts of the case, since they have a natural tendency to overburden and confuse the jury"].)  There was a significant danger that, in the absence of an instruction that fit the circumstances, the jury conflated the concepts of attempt and conspiracy, and relied on the conspiracy instruction—which requires only specific intent and at least one overt act—to find appellant guilty of first degree murder.  (See CALCRIM No. 651.)  The likelihood that the jury improperly used the conspiracy instruction to convict appellant of murder was increased by the erroneous felony-murder special-circumstance instruction that was given, which told the jury it could find the special circumstance allegation true if it found that appellant was a member of a conspiracy to commit robbery or burglary.  (See CALCRIM No. 730; part I.B.3.b, *ante*.)[22]

For these reasons, we conclude that the court's failure to instruct on attempt was not harmless beyond a reasonable doubt, and reversal of the murder conviction and felony-murder special-circumstance true finding are required on this ground as well. (See *Chapman v. California, supra,* 386 U.S at p. 27.)

### B.  *Contentions Relating to a Voluntary Intoxication Defense*

Appellant also argues for a reversal of the entire judgment in his contention that counsel was ineffective for failing to request an instruction on or argue voluntary intoxication, as well as the added claim in his habeas petition that counsel was ineffective for failing to investigate or develop evidence regarding the possible defense of voluntary intoxication.

We find problematic counsel's failure to investigate, request an instruction on, or present a voluntary intoxication defense, and have some concern about the effect of that failure on the first degree felony-murder conviction and special circumstance true finding, given that evidence of voluntary intoxication is admissible "on the issue of

---

[22] Appellant also points out that an instruction on attempt was needed because each juror "could have ascribed [his or her] own meaning to the term 'attempt' when in fact it has a very specific meaning particular to the law."

whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4, subd. (b).) We have already concluded, however, that reversal of the murder conviction and the special circumstance true finding are required in any case. (See part I., *ante*.)

Appellant's only other convictions in which specific intent was an element of the charged crimes were for conspiracy to commit robbery and conspiracy to commit burglary, with their accompanying firearm use and great bodily injury enhancements. (See *People v. Cortez* (1998) 18 Cal.4th 1223, 1232 ["conspiracy is a specific intent crime requiring both an intent to agree or conspire and a further intent to commit the target crime or object of the conspiracy"].) The evidence in the record, however, demonstrates that the conspiracy convictions were based on appellant's agreement to commit robbery and burglary and one or more overt acts in furtherance of those conspiracies, all of which preceded the alleged effects of appellant's voluntary intoxication.

Specifically, the information alleged that appellant committed the following overt acts, together with Nix: they drove to Fields's house on Santa Clara Street, they put on masks, appellant carried a gun, and they hid behind a hedge at Fields's house.[23] While appellant claims generally that his injection of methamphetamine after the arrival at Fields's house was the cause of his voluntary intoxication, his argument focuses almost entirely on evidence showing that, after the robbery plan was abandoned, appellant said, "Fuck that," and ran to confront Sovereign.[24] This conduct, however, took place *after* the alleged agreement and all alleged overt acts had been completed. Thus, when appellant

---

[23] The jury instruction on conspiracy listed these same alleged overt acts. (See CALCRIM No. 415.)

[24] For example, appellant states: "There is no evidence that [appellant] was acting irrationally when [he, Inong, Hunsucker, and Nix] first arrived at Fields's house, when he injected methamphetamine, walked to the edge of Fields's driveway, or when they first decided to abandon whatever so-called plan they had in place."

went to Fields's house with the shotgun he had gotten earlier in the day in anticipation of committing these offenses, and when he and his coconspirators donned masks and hid behind a hedge in front of Fields's house, the conspiracy offenses were complete. Moreover, even assuming there was evidence of intoxication from the moment appellant injected the methamphetamine behind Fields's house, the evidence shows that the intended agreement to rob or burglarize Fields and an overt act in furtherance of those crimes—driving to Fields's house—had already occurred.[25] Hence, a voluntary intoxication defense would not have affected the result as to the conspiracy offenses, which the evidence shows were complete before appellant's claimed reaction to the methamphetamine occurred.

Nor would an investigation, an instruction, or argument regarding voluntary intoxication have affected appellant's conviction for possession of a firearm by a felon, given that it is a general intent crime. (See *People v. Atkins* (2001) 25 Cal.4th 76, 81 ["Evidence of voluntary intoxication is inadmissible to negate the existence of general criminal intent"]; see also *People v. Jeffers* (1996) 41 Cal.App.4th 917, 922 [no specific criminal intent is required for offense of possession of a firearm by a felon; "general intent to commit the proscribed act is sufficient to sustain a conviction"].)

Furthermore, for all of the reasons already discussed, appellant's claim of cumulative error does not require reversal of the entire judgment. (See *People v. Hill* (1998) 17 Cal.4th 800, 844.)

---

[25] Appellant's counsel stated at oral argument that appellant was intoxicated throughout the day of the shooting. In his briefing, however, appellant made no suggestion that the defense of voluntary intoxication would be applicable to events occurring before he injected methamphetamine behind Fields's house. (See text and fn. 24, *ante*.)

**DISPOSITION**

Appellant's conviction for first degree murder and the felony-murder special-circumstance true finding are reversed. The judgment is otherwise affirmed.[26]

_____
Kline, P.J.

We concur:

_____
Stewart, J.

_____
Miller, J.

---

[26] In a separate order, we deny appellant's related petition for writ of habeas corpus.